**Alvin M. MARKS and Depix Corporation**

**v.**

**POLAROID CORPORATION.**

**Civ. A. No. 53–168.**

United States District Court,
D. Massachusetts.

Feb. 28, 1955.

Cedric W. Porter, Timothy H. Donohue, Boston, Mass., for plaintiff.

Donald L. Brown, Cambridge, Mass., Rowland Patrick Fish, Richardson & Neave, Boston, Mass., of counsel and Charles Mikulka, Cambridge, Mass., for defendant.

SWEENEY, Chief Judge.

This is an action for infringement of U. S. Patents No. 2,104,949 (hereinafter referred to as '949) and No. 2,199,227 (hereinafter referred to as '227) brought by the plaintiff Alvin M. Marks as owner, and the plaintiff Depix Corporation as exclusive assignee of said patents. By counterclaim the defendant Polaroid Corporation charges the plaintiffs with infringement of three patents owned by it, and with infringement of its registered trademark "Polaroid". A further charge of infringement of Reissue Patent No. 23,297 has been waived by the defendant during the trial, but this patent remains before this Court on the question of validity as requested in a prayer for declaratory relief filed by the plaintiffs.

In answer to the charges of patent infringement the parties have advanced the usual defenses of invalidity and noninfringement together with certain other defenses to be passed upon later in this opinion. The plaintiffs' reply further denies infringement of the defendant's trademark "Polaroid" and asserts that this trademark is invalid because it is a descriptive and generic word which indicates the type of product and not its source or origin.

### Subject Matter and History

The subject matter of all of the patents in suit relates to synthetic light polarizers and the process for their manufacture.

Polarization is a common phenomenon which occurs in the world of nature through certain natural media, e. g., the

sunlight reflected from a lake or ocean is, to a great extent, polarized due to the absorption by the water of certain light vibrations of an incident beam of light and its transmission of certain other vibrations of the same beam. This same phenomenon may be simulated by man through the use of artificial devices of the type which concern us here. Polarization is in essence the act or process of affecting light so as to cause the light vibrations to assume a definite form. When the human eye looks at an object transverse to the line of sight there are set up light vibrations in every direction. When the light is polarized the vibrations in all directions except one are eliminated by the absorption component of the polarizer. The remaining light vibrations are transmitted along the transmission axis of the polarizer and come through clear and unobscured to the eye of the viewer.

The phenomenon of Polarization has been known for more than one hundred and fifty years. However, until the development in the early part of this century of inexpensive synthetic polarizers, science has been limited to certain natural polarizers such as the Nicols prism, which costs approximately $1,000 a square inch and tourmaline, which costs $10 for two pieces, each 1/64th of an inch in size.

Attempts to manufacture synthetic polarizing crystals were made in 1853 by an English scientist named Herapath. He made minute fragile crystals of iodoquinine sulfate, which have come to be known as herapathites after their discoverer. Despite optimistic appraisals by Professor Herapath for the future of his discovery in the field of synthetic light polarizers, it does not appear that crystals made in accordance with his teachings ever became commercially successful.

In the late 1920's two precocious young scientists, Marks, a plaintiff in this action, and Dr. Land, President of Polaroid Corporation and patentee of three of the patents in suit, entered almost simultaneously into the field of synthetic light polarizers due to an interest each had in television. Independently and unknown to each other they consulted the same authority, Dr. Herapath, and attempted to develop large area synthetic polarizers in accordance with his teachings. Both experienced failure and struck out on new paths of their own. Marks, however, continued to follow the broad outlines of Herapath's teachings in the sense that his conception of the ideal polarizer was one consisting essentially of a single continuous crystal grown out of solution. After much experimentation he finally achieved the result desired by a process which consisted of suspending glass plates in a solution of the crystalline material over a relatively long period of time during which the solvent gradually evaporated, lowering the liquid level of the tank and causing the crystalline material to be thrown out of the solution and deposited on the surface of the glass supports. The relative motion between the liquid and the surface of the supports produced a surface tension which caused a specific alignment of the crystalline material. As we shall see later, alignment or orientation of the molecules of the substance is essential to procure a crystal effect. This process eventually ripened into the first Marks patent in issue in this suit.

Dr. Land, on the other hand, became convinced from his duplications of Herapath's work that no process involving the growth of large crystals would be satisfactory since any such process would be too time consuming. At about this time it occurred to him that a large synthetic polarizer sufficiently inexpensive in price ought ideally to be a plastic; a large plastic sheet like celluloid in great rolls. Instead of growing large crystals of herapathite and depositing them on a glass support, he conceived of the idea of making extremely small herapathites and embedding them in a plastic carrier. These submicroscopic needles or crystals were oriented to substantial parallelism by extruding the plastic containing the needles through small apertures. The mechanical stress thus produced causes the

needles to orient themselves just as logs going downstream travel along butt end first. Patent applications covering this Land process and product were filed in 1929. Subsequently, Land demonstrated his "J sheet", as the invention is called, to a Physics Colloquium at Harvard University in 1932, and in 1933 used it as a polarizer in connection with a stereoscopic system which he brought to Hollywood to demonstrate three-dimensional movies to Warner Brothers Laboratories. The basic patent on the J sheet is not in issue in this case. However, it is of interest in tracing the development of the art. Also it serves to cast doubt upon the plaintiff's contention that Marks was the first person ever to make and sell a synthetic polarizer.

It appears that after Marks had sufficiently developed his polarizer, his brother organized a company, known as Polarized Products Company, to exploit his product commercially. The Marks polarizing plates were first sold on the market in November of 1934 at prices of $16 per square inch and $1 for a plate ¼" x ¼" in size. These prices were later sharply reduced with the development by Marks in 1935 of the second patent in suit, called the intensification process. This patent discloses a method for speeding up the process of Marks' previous patent, then taking the crystalline deposit, which due to the increased speed is discontinuous or punctuated with holes or voids, and intensifying it by subjecting the crystalline field to a supersaturated solution of the crystalline material. In this manner an additional crystal deposit is thrown out of solution which fills up the voids and evens off the pre-existing crystalline deposit. By this method production was speeded up about 90 times and the cost reduced by 99%. Patent applications covering the intensification process were filed in 1937.

In the meantime, the first Polaroid Corporation had been organized in 1935 with Dr. Land as its president, and production of the J sheet was carried on. Two years later the present corporate defendant was organized with Land continuing as president and director of research. Subsequently Land began experimenting on a different type of polarizer employing cellophane and a direct dye or stain. Rolls of cellophane were swelled, stretched, and run through an iodine bath. Difficulty was encountered, however, with this process because the iodine was fugitive and would not stay in the cellophane sheet. Land experimented with different kinds of plastics and finally hit upon the complex of iodine with polyvinyl butyral. Immediately he shifted from polyvinyl butyral to polyvinyl alcohol and developed his "H sheet" which is made by taking a large roll of polyvinyl alcohol, heating and stretching it to orient the molecules, then affixing it to an unstretched backing of cellulose acetate, and floating the supported film of polyvinyl alcohol upon the surface of a bath containing a solution of iodine. A fourth step is employed in which the sheet is run through a bath of boric acid, which stabilizes the film and drives out excess iodine.

The Polaroid Corporation first began to sell its "H sheet" in 1940 and since that time it has effectively supplanted the "J sheet" type of polarizer.

Patent applications embodying the new Land products and processes were filed in October 1938 and May 1939, and eventually resulted in issuance of the three patents alleged in the defendant's counterclaim to have been infringed by the plaintiffs here.

Throughout the years Marks continued to manufacture and sell synthetic polarizers and to this end in conjunction with his brother and others caused several different business entities to be organized, including Polarized Products Company, Polarized Products Corporation, Pola-lite Company, Polalite Corporation, Depix Corporation, and Marks Polarized Corporation. The defendant here had previous litigation with at least one of these companies and its licensee. One action in Delaware against Polarized Products Corporation and Noma Electric Corporation was discontinued upon the companies ceasing to sell the product. In 1945 Polaroid brought another suit

against Polarized Products Corporation and Noma Electric in the Southern District of New York alleging that the manufacture and sale of polarized sunglasses by them constituted an infringement of one of Polaroid's patents also in suit in this case. Previous to this time Polarized Products Corporation had shifted from producing polarizers of the large herapathite crystals grown on glass and began to manufacture polarizers of butyral silicate on a plastic support. The litigation terminated in a consent decree in 1947 holding Polaroid's patent valid and infringed. However, a year before the entry of the decree Marks had taken steps to separate himself from Polarized Products. He had resigned as a member of the Board of Directors, had terminated his license to the corporation, had sold out his stock interest in it and had left its employ. He refused to consent to the entry of the decree insofar as the question of infringement was concerned. If doubts remain as to whether Marks should be held bound by the consent decree, this Court will not act upon them. Since this case has gone to a hearing on the merits it is not going to be decided on the thin ground of prior foreclosures, but will be treated independently of previous litigation.

After the entry of the consent decree and injunction, Polarized Products Corporation went into bankruptcy and sold its assets at a bankruptcy sale where Marks bought up part of the manufacturing equipment and whatever polarizing material was offered for sale. Thereafter he repaired and reconstructed the equipment and installed it in the cellar of his home in Whitestone, Long Island, where within six or eight months he started operations again on a very

modest scale. This business was carried on under the name of Polalite Corporation, a family corporation with Marks, his brother, and his mother as the only stockholders.

From the fall of 1948 until late in 1952 a polyvinyl butyral silicate polarizer was produced by Marks or Polalite Corporation at the premises in Whitestone. The defendant here claims that these past activities of Marks or of some company completely dominated and controlled by him and his brother constituted infringements of claims 1, 2, 3, 4, 5, 6, 17, 18, 19, 20, 22, and 24 of Patent No. 2,328,219 (hereinafter referred to as '219) and claims 11, 17, and 18 of Patent No. 2,-454,515 (hereinafter referred to as '515). As no evidence was introduced to show that either Marks or Depix is at the present time manufacturing polarizers of this type, any such infringement as is alleged to exist in this part of the defendant's counterclaim must be treated as consummated in the period 1948 to 1952.

Approximately two years ago a great impact was made upon the movie-going public with the showing of the first feature length 3–D movie [1], "Bwana Devil".

As a result, a very large demand was created within the motion picture industry for 3–D viewers, and the business of supplying them to the theatres became big business. The Polaroid Corporation had been making 3–D viewers for as far back as 1939 when it supplied four and a half million to the World's Fairs at New York and San Francisco, and for other projects in and around New York City at science museums, but when the 3–D pictures caught on with the public a great pressure was put upon Polaroid by various of the Hollywood fraternity to secure exclusive or other rights for dis-

1. Stereoscopic or 3–d movies are made by taking two images, one with a camera for the left eye, and the other with a camera for the right eye. When the pictures are shown two projectors are used. In front of each one is a polarizer which polarizes the light in which the images are projected upon the screen so that one image is vibrating in one direction and the other in another direction. The images are superimposed on a screen and they are separated by means of a light polarizing viewer which the theatre provides so that the left eye of the observer sees the image intended for that eye and the right eye of the observer sees the image intended for the right eye. This provides for clarity of view and the desired 3–dimensional effect.

tribution. Polaroid had already licensed Natural Vision Corporation as its exclusive distributor for a set period and refused all other overtures.

Depix Corporation, one of the plaintiffs here, was incorporated in February, 1953 by Marks, his brother, and their mother, and licensed to produce polarizers under the Marks patents. It appears that within a few months after the institution of this action, Marks resigned as president of Depix and the stock in that company, which the Marks family owned indirectly through ownership of the stock of another corporation, was sold out. In the meantime Marks and his family have organized another corporation known as Marks Polarized Corporation. At the present time Depix retains its corporate existence but it has discontinued manufacturing polarizing materials under license from Marks.

## Findings of Fact

Marks patent 2,104,949—granted January 11, 1938, on an application filed March 22, 1933, relates to crystalline formations formed on supporting mediums and to the process for producing the same.

The process disclosed consists essentially in depositing from solution on the surface of a transparent support a thin film of a crystalline material contained in the solution. The apparatus referred to as suitable for carrying out the process includes a tank and several supporting mediums which are mounted in the tank and arranged parallel with a uniform distance between them. The tank is filled with a solution of iodoquinine sulphate (for example) to a depth greatly in excess of the vertical dimensions of the deposit to be obtained on the supports. The supports are lowered into the solution perpendicular to the liquid level in the tank and then the liquid level of the solution is slowly moved with respect to the surfaces of the glass plates in such a way that it lowers with respect to the plates. In the example used by the patentee to illustrate his invention, the evaporation which naturally occurs in the system produces a satisfactory lowering of the liquid level, although under certain other conditions of operation other means for producing such a movement between the two mediums are claimed by the patentee.

As the liquid level lowers, the crystalline layer is deposited out of solution onto the surface of the glass plates. This takes place at the meniscus or point of contact between the plate and the solution where the solution is drawn upwards to a considerable extent due to the surface tension between the glass and the crystalline layer. The liquid in the meniscus is under tension in a vertical direction which acts to align the solution molecules in such a way that the iodoquinine·sulfate molecules, in crystallizing out of the solution, are definitely oriented so as to form effectively or actually a single crystal in contradistinction to a number of haphazard crystals. Working at atmosphere pressure and with a temperature between 18°C and 27°C, a lowering of 69 millimeters is produced in forty-five days.

The following seven factors are listed by the patentee as important in obtaining desirable results:

(1) The surface tension between the solution, the atmosphere above the solution and the supporting medium.

(2) The size, geometry, groups and immobility of the solvent molecule.

(3) The solubility of the crystalline substance dissolved in the solvent.

(4) The vapor pressure of the solvent and the partial vapor pressure of the solvent above the solution.

(5) The temperature of the system.

(6) The ratio of the evaporating surface area to the area of diffusion at the place where the liquid surface is bent upwardly.

(7) The rate of diffusion of the crystalline substance from the liquid surface downwardly into the less concentrated body of the liquid.

The patent mentions other crystalline material suitable in the process and describes in some detail the effect upon the process of modifications in the concen-

trations of solutions, in solvents, in temperatures, in withdrawal rates of supports, and in atmospheric conditions.

The resulting product is described as a unitary crystalline structure or layer deposited on the surface of the glass plates which in effect comprises a single crystal. The crystal is firmly attached to or mechanically interlocked with the glass surface without the use of any intermediate binding medium. The article is further described as a transparent isotropic plate, coated with a layer of substance capable of plane polarizing light in the same direction over the entire plate. The size of the crystalline coated surface is claimed in the specification to depend only on the size of the supporting surface, which within reasonable limits may be of any size.

Of the prior art references cited against this patent by the defendant, reliance is placed mainly upon a Belgian patent to Zimmern granted in 1924, an Austrian patent to Zimmern granted in 1928, two articles by Zimmern in Comptes Rendus, May 8, 1926 and May 17, 1926, and the alleged prior public use or prior invention in this country by Professor Mason and Dr. McClellan at Cornell University and their associates, Robert A. Smith and Louis W. Chubb, Jr., at Mahwak, New Jersey. None of these references were considered by the Patent Office.

The Zimmern patents, which are substantially identical, claim a process for the production of a polarizing surface which is simultaneously transparent, of large extent, and with elements which are all oriented essentially the same way.

In accordance with the process as specified, a concentrated solution of quinine bisulfate is first prepared and poured into a vat. A vessel containing five grams of metallic iodine is placed near the vat with a heating device added in order to accelerate the evaporation of the iodine. The entire arrangement is then covered by means of a bell jar. The iodine vapors escape from the vessel and react with the solution, giving rise to the formation at the surface of the solution, of a film of herapathite of greater or lesser extension or of several films being more or less adjacent to each other. The films are then removed from the vat by raising upward a sheet of glass which has previously been placed in the bottom of the vat and to which the film then adheres. However, the films thus obtained are not very highly developed and in order to obtain better results, the patent teaches the adoption of several alternate arrangements in addition. Included among these is the use of a very deep and very narrow vat provided with an orifice in its bottom so that the solution will flow very slowly (in at least several hours) through it in such a manner that, under the action of the capillary forces to which the herapathite film is being subjected it will come to adhere either to the walls of the vat or preferably to glass plates placed against the walls which can be removed easily. The patent also discloses use of an entire series of removable glass plates spaced so as to form a series of very narrow vertical spaces like in an electric storage battery.

In the May 17 Comptes Rendus article, Zimmern teaches that the crystallization takes place in the concave meniscus which wets the glass. He also discloses there that a temperature of almost 30°C is employed. The two patents specify that iodine in the form of a solution in alcohol or ether may be substituted for metallic iodine.

The nature of the product obtained is gleaned from these descriptions in the Zimmern references:

"* * * Plates * * * covered with well aligned herapathite extending over the major portion of their surfaces * * *."

"* * * A thin layer consisting of herapathite crystals, the orientation of which is the same throughout or at least shows no noticeable deviation."

"Regular strands of herapathite, transparent and of uniform orientation, which reach a size of about five millimeters on a side."

In the above references it is seen that Zimmern employs a vertical support or supports positioned in a deep tank; that he depends upon the principles of surface tension and relative motion between support and liquid level; that he precipitates crystalline growth at the meniscus formed between the surface of the liquid and the supports. Consequently none of these things are original with Marks. Further, Zimmern employs the same basic chemicals as Marks in the same manner with the exception that Marks uses concentrated solution of iodoquinine sulfate throughout whereas Zimmern starts with a concentrated solution of quinine sulfate which is reacted with iodine vapor to form a solution of iodoquinine sulfate. Both Zimmern and Marks operate at substantially the same temperatures.

The means disclosed by Marks to produce the relative motion between the supports and the liquid is evaporation. Zimmern produces this effect by running the solution off slowly through an orifice in the bottom of the tank. However, Marks distinctly recites in the patent that he is not limited to evaporation to bring about the desired relative motion but other means may also be used.

The '949 patent discloses that by using evaporation to lower the liquid level, a lowering of sixty-nine millimeters was produced in forty-five days. However, it is specified that this time element is by way of example and is not intended as a limitation.

The fact that Zimmern employs iodine in the vapor phase to react with the quinine bisulfate in solution rather than introducing liquid iodine into the solution at the start does not constitute an essential difference, especially when it is remembered that Zimmern discloses the substitution of one for the other in his two patents.

A comparison of the processes disclosed in the Zimmern references and this Marks' patent convinces me that the latter discloses no important step which is not also contained in the former and that as a result the two are substantially the same. For the above reasons I find and rule that the process disclosed in the Zimmern references constitutes a complete anticipation of the process claims in the '949 patent, and that the latter are invalid for want of novelty.

It is my opinion that the product claims of '949 are also invalid over the product described in the same Zimmern references. Marks describes his product as a unitary crystalline structure which in effect comprises a single crystal. Zimmern on the other hand describes his product as a thin layer of herapathite crystals extending over the major portion of the surface of the support in which the orientation is the same throughout or at least shows no noticeable deviation. From these descriptions it would appear that Marks' polarizing surface is made up of a single unitary crystal whereas Zimmern's layer is composed of a plurality of single unitary crystals of the magnitude of five millimeters on a side which are oriented to substantial parallelism. On examination of early Marks' polarizers introduced in evidence (as Defendant's exhibit C 15 and Plaintiff's exhibit 57) we discover what Marks' concept of single crystallinity is as applied to his product. It appears to mean substantially uniform orientation of crystalline growth as distinguished from a structure made up of crystalline deposits in which the individual elements are arranged in a haphazard fashion. The exhibits introduced show that Marks did not achieve perfect orientation, but a product in which certain vertical areas or strips were slightly out of alignment with the crystalline mass, or in other words, a product in which the orientation axis shifted very slightly from area to area.

Zimmern's product is composed of a system of small crystalline patches or skins covering the entire plate and arranged substantially parallel with such deviation as exists not being pronounced. While I am of the opinion that the two products disclosed are not identical, still I think that whatever difference exists is a difference of degree and not of kind

and that although Marks' product may be conceded to be a better polarizer than Zimmern's, it does not amount to invention over the latter reference. Consequently I find that the product claims of Patent No. 2,104,949 as well as the process claims of that patent are invalid.

The alleged prior public use of Mason, McClellan, Smith and Chubb, cited by the defendant as invalidating the Marks' '949 patent, commenced in the early part of 1930 after Professor Mason and his young assistant, McClellan, has been hired by Smith to attempt to duplicate and improve Zimmern's work.

This development work, together with the processes employed, the materials used, and the results obtained at the various stages of progress of the work, are all set out in depositions of Mason and McClellan and in correspondence between Mason and Smith submitted by the defendants as exhibits in connection with the depositions.

It appears that Smith's purpose in retaining the scientists at Cornell University was the ultimate utilization by him and his associates of any process developed there by Mason and McClellan in the commercial production of large area polarizers adopted to eliminate glare from automobile headlights.

The work of Mason and McClellan in the laboratory at Ithaca continued for approximately two years and after they had produced films of a character claimed by Mason to be usable for microscopic work, for headlight work and presumably for other things, it was eventually transferred to Mr. Smith's home at Mahwak, New Jersey, where Mr. Smith and Mr. Chubb carried on without the further assistance of Mason and McClellan.

Without going into detail as to the day to day experiments and developments of Professor Mason and his assistant, I am convinced from a careful scrutiny of the evidence on this phase of the case, that at least as early as January, 1931, (which is more than two years before the Marks' application was filed) the process employed by Mason and McClellan and the product resulting therefrom are sufficiently similar to the Marks' process and product of patent '949 as to constitute anticipations of the latter.

In reaching this conclusion, I am also mindful of certain differences which exist, i. e. in the process as practiced by Mason and McClellan greater withdrawal speeds were used; additional mechanical means for orienting the crystals were employed in the form of scratches and gaps provided on the glass plates; alcohol was often eliminated from the solution and acetic acid and water used alone as solvents; iodine was used in the vapor phase as in Zimmern rather than being added to the original solution in its liquid form.

In regard to the speed of withdrawal, Mason testified in his deposition that a wide range of speeds was tried but that he and McClellan were always striving for greater speed without sacrifice of quality [because] "we had in mind always that this must always be commercial and that a very slow method of growth, although ideal from the crystallographic theory, would not be economic if we could not turn out quantities of film in a commercially feasible time * * *."

■ It is my opinion that what is claimed by Marks in his patent is certainly implicit in this earlier process which included these additional or diverse steps and when considered from this point of view, the enumerated differences do not destroy the effect of the prior public use as anticipation. Nor does the fact that a product made in accordance with this earlier process was never sold or commercially successful change this result. Smith v. Hall, 301 U.S. 216, 233, 57 S.Ct. 711, 81 L.Ed. 1049.

The plaintiffs further seek to avoid the effect of the prior use by asserting that the process as practiced by Mason and McClellan at Ithaca, and subsequently by Smith and Chubb, Jr., at Mahwak, was a secret process and hence does not constitute a "public use".

However, the plaintiffs offered no affirmative evidence in support of this contention to show that positive measures to assure secrecy were taken by the interested parties such as forbidding strangers or outsiders access to the premises where the process was practiced, enjoining one another, co-workers or subordinates to secrecy, keeping important equipment, data and working premises under lock, etc.

On the other hand, I find from the evidence that there was a constant going back and forth of the other men in the Microscopy Department, in and out of the laboratory at Cornell, during which many discussions were carried on about the problems involved.

■■ One who alleges a secret use should offer evidence to sustain it. E. W. Bliss Co. v. Southern Can Co., D.C., 251 F. 903. The plaintiffs have failed to do this in the face of testimony which seems adequate in my eyes to show a prior public use of the process under consideration.

For the above reasons I find that Marks' Patent No. 2,104,949 is invalid on the additional ground of prior public use of the patent more than two years before the application for 2,104,949 was filed.

Marks patent 2,199,227—granted April 30, 1940, on an application filed June 11, 1937, relates to a method for coating a supporting structure with a crystalline substance and may be considered as an improvement on Marks' earlier patent. It involves two steps. The first step relates to the depositing of an initial crystalline coating on the support at speeds greatly exceeding those employed in the first patent. This initial layer or crystalline field, as it is described, is incomplete or imperfect in the sense that it is punctuated with voids or little holes in which the crystalline material is absent. It may appear in three different forms, i. e. as an "island structure" in which open areas for the most part join each other; or as a "semi-meshed structure" where joined open areas and joined crystal areas exists; or as an "open-meshed structure" where the crystalline structure forms a lattice in which the open areas for the most part do not join.

The apparatus described as suitable for depositing the initial layer is much more detailed than that outlined in the earlier Marks patent. It provides for a small tank which contains the crystalline solution suspended by a pontoon device on top of liquid within a larger tank. A rack of glass plates is suspended within the solution as before, but in the present patent the relative movement between the supports and the liquid surface is accomplished both by evaporation and by running out the liquid in the larger tank through a valve in its bottom. The specification explains how, by varying certain contributing factors, any one of the three types of crystal fields may be obtained. Further, it shows how, by relating certain factors, polarizers may be produced with their polarizing axes at different angles with respect to the plane of the solution surface. To obtain a crystalline coating of substantially uniform optical orientation, the process is so controlled and the constituents used are so selected as to cause one particular alignment with respect to the solution surface to dominate over all recessive alignments. As an aid to this result, a vibrator is provided in the apparatus which produces a vibratory motion between the solution surface and the plates. Once the desired crystal field has been deposited, then the second step of the process, called intensification, is employed.

This consists in flowing over the crystal field a supersaturated solution of the same crystalline substance which is allowed to remain on the plate for a short time and then is run off. By this treatment new crystalline material is thrown out of solution which fills in the open areas or voids of the pre-existing crystal field and causes it to grow. Inasmuch as the optical orientation of the crystal field is substantially uniform throughout, the crystalline structure grown from the intensification step is also substantially optically uniform. The intensification

procedure may be repeated two or three times in order to thicken the coating.

Claim 9 of patent 2,199,227, alleged to be infringed by the defendant, reads:

"9. The method of completing a crystalline coating in the form of interlocking crystal areas and open areas, the crystals of which have substantially uniform optical orientation, comprising applying to the coating a supersaturated solution of the crystalline substance to cause the crystals to grow from the solute of the solution to complete the crystalline coating and form a substantially unitary crystalline structure of the same orientation as said original coating".

It is to be noted that what is claimed here is only the method of intensification.

The first reference cited by the defendant as anticipating claim 9 is an article written by Dr. Herapath in 1883 in Philosophical Magazine, Volume 6, 4th Series, pages 346–381. After describing his process for isolating and mounting crystals of herapathite upon a glass support, Herapath discloses the use of additional quantities of iodine in three different connections. In the first disclosure he employs it added to a little cold distilled water to wash off any excess mother liquid and to prevent the crystals of herapathite from redissolving. In the second instance he teaches placing the dried crystals under a cupping glass, having a watch-glass with a few drops of tincture of iodine in it. "This", he says, "gives a decidedly black tone to the field; and if the crystals were before too thin to obstruct all the light, and thus give a red or purplish violet tint, its power of polarization will be very materially improved by following the above simple directions."

In the final instance Herapath provides for saturating with iodine the cement, i. e. Canada balsam, used to secure a covering plate to the mount. The iodine is used here in order to prevent the Canada balsam from attacking the crystals and dissolving out the iodine.

I find that this Herapath reference does not anticipate the intensification process as described in the Marks patent.

Herapath's additional applications of iodine are in the vapor or liquid phase uncombined with the ingredients of the previously deposited crystal as in the Marks disclosure. Also the former uses subsequent iodine treatments either to protect and preserve the crystal or to increase its polarizing properties. Marks, on the other hand, employs his intensification process for additional purposes, among which are to speed up the output of his product and to fatten up or increase the thickness and continuity of the pre-existing crystalline structure.

The prior public use or prior invention of Mason, McClellan, Smith and Chubb cited earlier against the first Marks patent, is also relied upon by the defendant as anticipating the '227 patent.

From a consideration of the evidence introduced to support this reference, it is evident that a process referred to as "intensification" by these scientists was employed by them commencing early in their work and continuing throughout the course of its development. Numerous references to an intensification step are contained in the correspondence between Mason and Smith. Physical exhibits of intensified deposits of crystals made by Mason and McClellan in 1931 and 1932 were introduced in evidence as defendant's Exhibits D 30, D 37, D 38 and D 39.

Mason employed the procedure of building up the thickness of the layer of crystal by depositing additional crystalline material on it from solution which then increased the thickness of the portions that were too thin and gave them, as well as the originally thick portions, an adequate polarizing effect and adequate cut-off. This process of rendering the film more uniform in thickness depended on having crystalline material substantially covering the glass plate on all portions.

Chubb used the intensification process in the summer of 1932 when he came to

work for Smith at Mahwak, New Jersey. According to him there were a number of ways in which the intensification was performed including dissolving herapathite compound itself in warm alcohol, so that the solution was supersaturated, and then coating the first layer either by spraying or flowing on the additional crystalline material.

A consideration of this evidence convinces me that the intensification process, as claimed by Marks in Patent No. 2,199,227, was not new with Marks and that as a result claim 9 of the patent is invalid for want of novelty.

Claim 11, also alleged to be infringed by the defendant, reads as follows:

"11. The method of coating a supporting surface with an optically continuous crystalline coating of a substantially uniform optical orientation, comprising first crystallizing on the supporting surface a crystal field of an island, semi-mesh or open-mesh structure in which the crystalline structure is of substantially uniform optical orientation, and applying to the supporting surface thus coated a super-saturated solution of the crystalline substance to cause the crystal field to grow from the solute of the solution to complete the coating to form a substantially unitary crystalline structure having the same optical orientation as said original coating."

This claim involves two steps; a first step in which a basic crystal field of one of the types specified is deposited; and a second step in which the crystalline structure is completed by intensification. Granted that there is nothing new in the intensification process considered by itself, still this step in combination with a new or different preliminary step may amount to invention. I do not read the '227 patent as urged by the defendant, that the only invention possibly contained therein relates to the intensification process. A simple reading of the twenty claims shows that Marks claims as invention additional features either in combination with or apart from intensification.

Considering the invention disclosed in this patent in its broadest aspect, it appears to contain several novel features. For instance, means are disclosed for producing a crystalline field undercoating of the several different types enumerated which is of a substantially uniform optical orientation. Further the disclosures show how to control the alignment of this coating so that it may assume various angles with respect to the solution surface and block out any recessive alignments tending to form.

The advantages of first depositing one layer of the types specified and then superimposing another layer on top of it are: such plates can be produced more rapidly; the alignment of the desired crystalline structure is easier to control; and desired uniformity is more easily obtained since factors tending to cause misalignment are rendered less effective.

In addition to the above new disclosures in the patent, other improvements in the earlier Marks process include the provision of additional means for lowering the liquid level in the solution tank intended to act simultaneously with the lowering caused by evaporation, greatly accelerated withdrawal times, and the provision of a vibrating motion between the solution surface and plates which aids in obtaining the desired uniform alignment.

These several innovations employed in the first phase of the improved Marks process when combined with the second phase or intensification step amount to invention. Claim 11 of the patent is directed to this combination of two steps, one new and the other old. Its wording is not a comprehensive statement of the entire process involved in the first step, however it does particularize in describing it to the extent that it requires the first deposit to be "a crystal field of an island, semi-mesh or open-mesh structure". This is sufficient to remove claim 11 from the work done by Mason, McClellan, Smith and Chubb. None of the other cited references anticipate this claim.

For the above reasons I find that claim 11 of patent 2,199,227 is valid.

Even though we were to find all the Marks patent claims valid, the complaint must nevertheless be dismissed on the ground that the defendant has not infringed the plaintiffs' patents. The defendant manufactures its H sheet, the alleged infringing device, by heating a sheet of polyvinyl alcohol which it purchases in rolls; stretching the heated sheet to orient its molecules; backing the stretched sheet to a sheet of cellulose acetate which acts as a support for the polyvinyl alcohol sheet; floating the backed sheet upon a solution of iodine with the stretched polyvinyl alcohol in contact with the solution so as to stain the polyvinyl alcohol with iodine; and finally running the stained sheet through a boric acid bath to stabilize it.

The two claims of patent '949 alleged to be infringed by H sheet, claims 5 and 16, are method and product claims respectively. Claim 5 is directed to "the method of depositing a crystalline structure on a supporting surface which comprises dissolving the crystalline substance in a liquid medium, at least partially immersing said supporting surface in said liquid medium, causing said substance to be crystallized from said medium and to be deposited on said surface with a regulated orientation, and simultaneously relatively so moving said liquid medium and supporting surface in such manner as not to break the character of the crystalline structure deposited".

Claim 16 calls for "a light polarizing device comprising a transparent supporting medium having a surface coated with a crystalline substance having the inherent characteristic of polarizing ordinary incident light, said coating comprising a substantially continuous crystalline layer directly crystallized on the surface from solution and forming effectively a single crystal of substantially uniform optical orientation".

Marks claims that the defendant's process and product read directly on these claims in these respects: the sup-

port is the cellulose acetate backing; the immersing of the support takes place when the sheet is run over the iodine bath at which time the crystalline substance, i. e. iodine, is crystallized from the liquid medium and deposited on the cellulose acetate with a regulated orientation, and the relative motion between support and solution takes place, with the result that a crystalline coating of the kind described by Marks is found in the defendant's H sheet deposited on the type of support claimed by Marks.

The plaintiffs seek to read claims 9 and 11 of the second patent (set forth above) on the defendant's process by the following reasoning: when the backed film of polyvinyl alcohol is floated over the solution of iodine, the iodine penetrates the pores of the polyvinyl alcohol, and reaches to the surface of the cellulose acetate layer where some of it crystallizes out in the form of an island structure, the remainder of the iodine being present in the interstices surrounding the islands in the form of dissolved unoriented iodine, at this stage the first step of the process has been completed: in the intensification step which follows the iodine not yet crystallized is driven in and completes the crystalline coating. This takes place in the boric acid bath where as the boric acid enters the structure, it causes the solution of iodine present in the interstices to become supersaturated with respect to the island structure which results in additional crystals being deposited to fill the voids and complete the crystalline coating.

The testimony and evidence offered to refute the charge of infringement points out several critical differences between the products and processes of the parties and in many important respects contradicts the testimony of Mr. Marks, the principal witness offered by the plaintiff to establish the charge of infringement.

From a consideration of all the evidence on the question of infringement, I make the following findings:

1. The iodine in H sheet is present in a non-crystalline form, being an absorp-

tion complex in which molecular oriented polyvinyl alcohol is complexed with iodine. This finding is supported by X-ray diffraction patterns of defendant's product, which the defendant's expert, Dr. Mark, testified failed to show the type of X-ray finding typical of crystalline iodine.

2. Nothing is deposited from solution on to the cellulose acetate support at any stage of the H Sheet process, as no iodine ever penetrates to the cellulose acetate backing. The iodine is absorbed by the outer layer of polyvinyl alcohol which it penetrates to about 25% to 30%, leaving the remaining portion of the polyvinyl alcohol free from any iodine.

3. The iodine employed in the process of H sheet is a dilute solution, not a concentrated or supersaturated solution.

4. The defendant's process does not produce at any stage of the manufacture of H sheet a crystal field of any of the types specified in claims 9 and 11 of '227, but to the contrary "H Sheet" appears as a homogenous mass under a microscope which does not resemble any of the microphotographs appearing in the second Marks patent.

These several ways in which the process and product of defendant fail to read upon the claims in litigation are crucial and form a sufficient basis for a holding of non-infringement.

 However, in the view I take of the processes and products of the litigants, these distinguishing characteristics are not the sole basis for my finding of non-infringement, since I am convinced that in a larger sense a reading of the claims of plaintiffs' patents to cover H Sheet and the process for its manufacture is unrealistic. In order for the plaintiffs to assert infringement here, they are practically forced to take inconsistent positions in that they must alternately urge a narrow construction of the claims sued upon in order to avoid anticipation by such similar devices and methods as Zimmern and Mason and McClellan, and a broad construction in order to claim infringement by such diverse

products and processes as those of the defendant. The fact that the claims of the Marks patents might be phrased in terms broad enough to cover many features of defendant's process and product does not in itself establish infringement. The claims are to be read in connection with the specifications, and a patentee's broadest claim can be no broader than his actual invention, Kemart Corp. v. Printing Arts Research Laboratories, 9 Cir., 201 F.2d 624, 629.

Viewed in this light the plaintiffs and the defendant reach different results by quite different means. This is seen, for instance, from the fact that the defendant produces its polarizers in sheets one thousand feet long and three feet wide at the rate of twenty feet per minute, whereas following the first Marks patent polarizing areas just a fraction of this size are produced only with the lapse of a considerable time. Further, the continuous commercial process of the defendant in which large rolls of the polarizing sheet are run first through a hot oven, then stretched, bonded to a backing sheet, and floating on an iodine bath and finally stabilized in a boric acid bath, is broadly divergent from a process in which crystals are carefully grown on a dipped support or supports through the use of natural crystallographic forces and then, as in the case of the second patent, are intensified by a subsequent pouring on of the same material in supersaturated form.

Similarities do exist, though due in large part to the broad wording of the claims of the patents. In any case, the differences are more considerable than the similarities. Consequently I hold that patents '949 and '227 are not infringed by the accused process and product of the defendant.

### Conclusions of Law

 I conclude and rule that claims 5 and 16 of Patent No. 2,104,949 and claim 9 of Patent No. 2,199,227 are invalid for anticipation or lack of invention; that claim 11 of Patent No. 2,199,-227 is valid; that if claims 5 and 16 of

the first patent and claim 9 of the second patent are held to be valid, still the complaint must be dismissed on the ground that none of the claims of the plaintiffs' patents have been infringed by the defendant.

Validity of the Defendant's Patents

In its counterclaim the defendant charges plaintiffs with infringement of three patents to Dr. Land, No. 2,454,515 (hereinafter referred to as '515), issued November 23, 1948, on an application filed October 29, 1938; No. 2,328,219 (hereinafter referred to as '219), issued August 31, 1943, on an application divided from the application filed October 29, 1938 during the pendency of an interference in which the original application was involved; and No. 2,237,567 (hereinafter referred to as '567), issued April 8, 1941, on an application filed May 4, 1939.

The specifications of patents '515 and '219 are substantially identical, the difference being that the parent, i. e. '515, is generic, claiming as the material to be used transparent, linear, high polymers such as a cellulose compound, as for instance cellulose acetate or ethyl cellulose, or regenerated cellulose or a vinyl compound, such as a plasticized vinyl acetal resin, whereas the material claimed in '219 is more specific, being limited to the transparent vinyl compounds, with some claims further limited to a vinyl acetal resin or to polyvinyl butyral.

Both patents are directed to a product which is a new and improved light-polarizer, and to the process of manufacturing the same which comprises rendering the plastic rubber-elastic, stretching it while in that state substantially to the limit of extension of its rubber-elastic state, then holding it in the stretched, extended position or setting it so that the deformation set up in the sheet is retained. At some stage of the process, either before or after it has been stretched, the plastic sheet is dyed, either by a direct cotton dye or a suitable mordant dye, or by iodine or bomine or a metal, such as mercury, silver, gold, copper, etc.

The specifications recite certain tests for determining whether products fall within the scope of the invention, such as degree of tensile strength, directions of monochroism within the sheet, presence or lack of polarized light interference and transmission percentages of the sheet for both components of an incident beam of light. The specifications teach that in every case the plastic should be rendered rubber-elastic. This last term is defined as an elastic condition closely similar to the elasticity possessed by vulcanized rubber, in which state the plastic may be stretched or extended an appreciable amount without permanent distortion or alteration in the structure of the sheet so that when the stress or strain is relieved, the sheet tends to return to its original form and shape. The plastic may already be in the rubber-elastic state when purchased (as in the case of Vinal which contains a plasticizer) or may be rendered rubber-elastic either by heating or by adding a swelling agent, such as sodium hydroxide.

It is further specified that the extension of the treated sheet should be substantially to the limit of its rubber-elastic stretch. "Generally speaking this means that the sheet should be extended substantially to, but just below, the point where it ruptures." "However," the specifications add, "this is not a completely satisfactory test, for in many cases the plastic sheet will not rupture even if extended beyond the limit of its rubber-elastic state."

Three product claims and one process claim of the '515 patent are alleged to be infringed by the plaintiffs. These four claims define the material to be used as a transparent, linear, high molecular weight organic plastic or as a light-transmitting high molecular weight synthetic linear polymer.

Claim 11 calls for forming a uniform thin layer of the plastic, applying a force to it while heated in such direction as to align the molecules of the plastic in parallelism and at some stage of the process incorporating a dichroic dye within the layer.

Claim 12 calls for a plane polarizing film which has been extended under stress in the solid unoriented state with the polarizing substance contained in the solid polymer, to a state of permanent high linear extension and molecular orientation of the polymer and of the polarizing substance in the direction of the stress.

Claim 17 calls for a product in which the molecules of the plastic and the dye are oriented to substantial parallelism and in which the polarizing sheet has been so highly extended in the rubber-elastic state that the directions of monochroism within the sheet make with each other an angle greater than 160°.

Claim 18 calls for the product of claim 17 in which the dichroic dye comprises iodine.

The defendant charges the plaintiffs with infringement of claims 1 to 6, 17, 18, 19, 20, 22 and 24 of patent '219.

Claims 1 through 6 call for a light polarizer comprising a sheet of a transparent vinyl compound which has its molecules substantially oriented and a dichroic substance incorporated therewith. These claims further distinguish from one another in calling for an angle of monochroism within the sheet greater than 165°; a dichroic ratio in excess of 9; an absorption percentage of 98 of one component of incident light; a dichroic substance comprising an element; and a dichroic substance comprising iodine.

Claims 17, 18 and 19 are directed specifically to polyvinyl butyral with further specification in relation to the dichroic substance used and the angle of monochroism.

Claims 20, 22 and 24 call either for the process of making a light polarizer by extending a rubbery-elastic sheet of the plastic until the molecules are substantially oriented or for a product in which the plastic is under internal linear strain so that it will contract parallel to a predetermined direction if the strain is released or for such a product in which the dichroic substance is iodine.

Patent No. 2,737,567 which is a continuation in part of the '515 patent, is directed specifically to polyvinyl alcohol as the plastic material to be used in the production of polarizers. According to the process disclosed, a cast sheet of polyvinyl alcohol is heated to a temperature at which it can be extended by stretching, but without flowing. A suitable temperature is one in the neighborhood of 130°C. The sheet is then stretched until its molecules are in substantially oriented alignment. The degree of stretch may be varied widely, i. e. from two and one-half to eight times the length of the sheet, with the understanding that in general the greater the stretch, the more efficient the polarizer produced by following the invention. There is nowhere in this patent the limitation that the sheet be stretched in the rubber-elastic state or that the stretch be to the limit of extension of that state. The stretched sheet is then stained with a solution of a polarizing polyiodide, the stain preferably being applied in the form of a water solution.

The dye may be applied to the sheet in any of a number of ways. It may be sprayed on the sheet, or the sheet may be passed through the solution, or it may be incorporated with the solution of polyvinyl alcohol prior to the casting of the film. Suitable plasticizers, such as glycerine may be employed with the polyvinyl alcohol in forming the sheet. The specifications point out that ten per cent by weight of such plasticizers has not proved excessive.

The product produced by the invention is described as a substantially uniaxial polarizer, consisting of a sorption complex of iodine on solid polyvinyl alcohol which shows a transmission of ordinary light exceeding 40% and a percentage polarization of 99.98%.

Of the several claims of this patent sued upon by the defendant, the broadest seems to be claim 1 which calls for "a light polarizer consisting of a sorption complex of a dichroic stain on molecularly oriented solid polyvinyl alcohol."

Claim 2 adds the features that the polarizer be a uniaxial sheet and that the dichroic sorption complex be a substantial absorber for light vibrating parallel to its axis and a non-absorber for light vibrating perpendicularly to its axis.

Claim 5 differs only slightly from claim 1.

Claims 7 and 8 are specific in calling for a dichroic stain comprising iodine and a water soluble dichroic stain respectively.

Claim 9 calls for lamination to a transparent supporting sheet.

Claim 18 is a process claim calling for essentially the same steps outlined in the description of the invention above.

Reissue Patent No. 23,297, which is before us only on the question of validity, is directed to a new and improved light-polarizing material. In essence it teaches subjecting the product of patent 2,737,567 to a further step in order to improve its stability against heat and moisture. This is done by treating the molecularly oriented, iodine-stained sheet of polyvinyl alcohol with a boron compound, preferably a concentrated solution of boric acid. The result of this process is to convert a minute layer adjacent to the surface of the sheet into the reaction product of polyvinyl alcohol and the reagent used in the solution, i. e. the boric compound. The properties of the product indicate that it is a cross-linked ester of polyvinyl alcohol, more specifically designated as polyvinyl orthoborate. This layer is highly unreactive to heat and other forces affecting the stability of the iodine stain within the sheet. It is resistant to water and water vapor and also appears to seal the iodine in the body of the sheet in the same way that it seals out moisture.

In the earlier part of this opinion, two different types of polarizers were discussed: the suspension type and the Marks crystalline deposit type. The polarizers of the three Land patents in issue constitute yet a different type of polarizer: one in which various plastics are dyed or stained to form a complex which acts as an efficient light polarizer. However, Land was not the first broadly to teach the art the manufacture of this kind of polarizer. The prior art references cited by plaintiffs show that Ambronn and Fry, Preston, and Kasemann had taught staining or dying plastics to make polarizers prior to the date of Land's applications. Further, many of the same materials and dyes used by Land are employed in these same references. For instance, both Preston and Ambronn & Fry disclose the use of cellophane in their articles. The Kasemann patent discloses in addition to cellophane, cellulose esters and particularly cellulose acetate. All these materials belong to the class claimed in the first Land patent, i. e. the transparent linear high polymers. The Ambronn & Fry reference teaches dying with elements the same as in Land, including the reduction of a salt of a metal to the metal itself, and mentions all of the elements mentioned by Land as suitable for use in producing dichroism. Staining with direct cotton dyes and iodine is also suggested.

Land's predecessors in the field also disclosed stretching or extending of the plastic material in order to orient the molecules in substantial parallelism. It was known and taught that the greater the extension of the material, the greater would be the orientation of its molecules, with the result that a more efficient polarizer would be produced.

Ambronn and Fry in their article on the Polarization Microscope in 1926 (Plaintiffs' exhibit 64, tab 18) disclose an apparatus for the stretching of strips of gels in order to orient their micelles. In this same article they teach that double refraction, which is a measure of the degree of orientation, increases with elongation and then flattens off as the molecules become essentially parallel to one another.

Five years later Preston, in an article entitled "The Cellulose-Dyestuff Complex", concluded in the summary that the dichroic constant (a measure of the efficiency of a polarizer commonly recognized in the art) was a function of the

degree of orientation of the cellulose structure and that this dichroic constant increased appreciably in the case of only slightly oriented structures with the application of tension along the axis of the fibre during dyeing and drying.

The teachings of these scientists appear to be followed and practiced by Kasemann in U. S. Patent No. 2,236,972 where the patentee points out the desirability of subjecting the films or sheet to an additional mechanical stretch in a longitudinal direction during any stage of the manufacturing or dyeing process in order to orient the molecules. To accomplish this result, Kasemann outlines an apparatus consisting of two rollers with a stretching device. During all the various stages of the process a continuous increase of the distance of the two rollers is effected with a view to stretching the endless film band as long as it is still wet and able to be stretched.

Thus it is seen that the prior art suggested the stretching of several of the same materials as described by Land and the dyeing and staining of such materials with iodine, metallic elements and direct cotton dyes to make a polarizer.

If this much is old to the art, what then has been Land's contribution in this field? In answer to this question counsel for the defendant urge here, as they did previously in prosecuting the patent applications before the Patent Office, that at least in respect to the first patent, the key to the invention resides in the disclosure of placing the various plastics in the rubber-elastic state and stretching them while in said state to the limit of extension of their rubber-elastic state.

Thus the defendant treats as critical and the secret to making better polarizers of this kind both a reduction of the polymeric material to a particular state or condition of physical behavior prior to stretch and a particular type of stretch while in this state.

From a perusal of the prior art references cited by the plaintiffs, there appears to be no mention of these conditions as critical or productive of a more efficient polarizer. The disclosure on page 2, column 2, lines 37 to 43 of Land patent 2,011,553, claimed by plaintiffs to touch on these points, does not appear to teach the manufacture of any type of polarizer at all, since it calls for elimination of the suspended asymmetric polarizing particles necessary for the formation of the kind of polarizer to which that patent is specifically directed and fails to provide for the application of a dye or stain to the oriented plastic as called for in Land's '515 patent. In any event, these lines from the '553 patent fail to teach the necessity for rendering the plastic rubber-elastic before it is stretched on the mechanical bed provided for in that patent and do not set a limitation on stretch to the limit of extension of the rubber-elastic state.

Land claims invention in his teachings in relation to rubber-elastic state and stretch. The plaintiffs attack the inventiveness of these disclosures. First, they argue that for the defendant to claim one or both of these limitations as the invention of the '515 patent would involve it in a basic contradiction in that the defendant in attempting to overcome during the trial a reference consisting of a patent to Bailey and Brubaker, introduced in evidence to show priority of conception a memorandum which, in the words of the plaintiffs, "does not disclose rubber-elasticity, but on the contrary discloses the desirability of a non-elastic stretch".

This patent to Bailey and Brubaker was applied for nearly one month prior to the filing date of the '515 application. It contains many similarities to the '515 patent, including the disclosure of the use of synthetic linear polymers, which are dyed and extended under stress in the solid unoriented state to form a polarizer.

Land had earlier been involved in an interference proceeding with this patent and in accordance with patent office procedure, he copied certain claims from it including claim 12, which contains no express limitations to rubber-elastic state and stretch, but only requires that the

polymer be extended in the solid unoriented state. Land was eventually awarded the counts in interference, after the other party had filed a disclaimer; and the copied claims were allowed in the '515 patent. One of these claims, i. e. claim 12, is sued upon by the defendant in this case.

I find on the evidence and testimony submitted on the issue of priority between Land and Bailey and Brubaker, that Land was the first to conceive the subject matter contained in claim 12 of the '515 patent, and that as a result, the Bailey and Brubaker patent does not constitute a valid reference on the question of novelty or for any other purpose. In accordance with this finding, I have eliminated this reference from consideration in the discussion of the prior art above.

From a close examination of plaintiffs' Exhibit 2 and the testimony of its author Chubb, I am convinced that the memorandum, while not expressly mentioning rubber-elastic state as such, clearly calls for this condition by implication since it shows that each one of the plastics mentioned was treated prior to stretch in one or more of the different ways enumerated in the Land patents for rendering them rubber-elastic.

I am satisfied with Chubb's explanation of the paragraph in the memorandum which the plaintiffs claim negatives the concept of rubber-elasticity. As he said, it is a matter of degree. "Vinal is elastic without plasticizer in it; it is unduly elastic with plasticizer".

Consequently it is not inconsistent for the defendant to rely upon plaintiffs' Exhibit 2 to show priority of invention over Bailey and Brubaker. Further the defendant may continue to insist upon its theory of rubber-elasticity while attempting to carry its date of conception back of Bailey and Brubaker, even though this reference does not disclose rubber-elasticity as its invention, since within the doctrine of inherency, Land in the specifications of his '515 patent discloses everything contained in the copied claims, and at the same time he discloses more. In other words, stretching in the rubber-elastic state is a more critical limitation than stretching in the solid unoriented state and yet the former includes the latter.

However, since I am convinced that whatever invention resides in the first Land patent consists in the teachings of rubber-elastic state and stretch, claim 12 and every other claim of this patent which is not expressly or by necessary implication limited to these concepts are open to attack by the pertinent prior art references.

The plaintiffs' next attack upon rubber-elastic state and stretch consisted in testimony of their expert witness, one Dr. Beckmann, to the effect that the several disclosures in the patent of these conditions as applied to particular materials are inconsistent, vague and indefinite. Consequently, Dr. Beckmann concludes that there is nothing critical about the rubber-elastic state as disclosed in the patent.

I do not share this conclusion. Granted there are certain latitudes and an absence of painstaking precision in defining the boundaries of the rubber-elastic state in reference to certain examples contained in the specification, still in view of the rather specific definition of the rubber-elastic state found in column 9 of the specifications and also with the fact in mind that the several plastics employed react differently and require different treatments in accordance with their physical natures, I cannot find on the whole such an indefiniteness or inconsistency in the various disclosures of rubber-elastic state as would destroy the value of this concept. And I am convinced from the evidence that the teaching of rubber-elasticity does have worth, despite the plaintiffs' arguments to the contrary.

It is not disputed that polarizers made in accordance with the teachings of the '515 patent have substantially higher dichroic ratios than the cellophane polarizers of the prior art which failed to employ rubber-elastic stretch.

Others in the art had taught that higher dichroic ratios would result from increased orientation of the molecules of the plastic used. To achieve such increased orientation (and to retain it once it has been achieved) was presumably the purpose of Land's disclosure of rendering the plastic rubber-elastic. Thus his contribution consists in teaching the art a particular method or approach to secure the desired result of optimum orientation. In furnishing a solution to the elongation problem, this contribution presents a reliable procedure and guide to which those concerned with the production of polarizers may turn as an aid to making more efficient polarizers.

For these reasons I find that Land's teachings in relation to rubber-elastic state and stretch represent an advance over the prior art which amounts to invention.

■ However, since I have found that invention resides in these features alone, the validity of each of the claims sued upon here depends on whether or not they are drawn so as to include one or both of these limitations, either expressly or by necessary implication. I do not find this to be the case with claim 12 of the patent, which as drawn reads upon the prior art references. This claim cannot be saved by reading into it limitations contained in the specifications or other claims of the patent. See Western States Mach. Co. v. S. S. Hepworth Co., 2 Cir., 147 F.2d 345; Secretary Pen Co. v. Everlast Pen Corp., 2 Cir., 186 F.2d 575; Landis Mach. Co. v. Parker-Kalon Corp., 2 Cir., 190 F.2d 543.

■ For the above reasons I find that claims 11, 17 and 18 of patent 2,454,515 are valid and that claim 12 of the same patent is invalid.

The plaintiffs attack the validity of the second Land patent in suit, i. e. '219, by reasserting against it the same prior art references relied upon to defeat the first Land patent.

■ Since this patent is a division of the '515 patent, it must rest upon disclosures in the parent application, with the added requirement that it must itself contain patentably distinct subject matter which amounts to invention. See In re Seebach, 88 F.2d 722, 24 C.C.P.A.; Patents, 1101. As mentioned above, the claims of this patent are specific to the vinyl compounds and polyvinyl butyral, and in this respect they distinguish sufficiently from the claims of the '515 patent.

No art has been cited by the plaintiffs which discloses use of the vinyl compounds in the manufacture of the type polarizer under consideration. This disclosure is concededly novel and as we discover from a reading of the patent, makes possible a superior light polarizer. In the absence of more compelling prior art references and a stronger attack on the validity of this patent, I am not prepared to disturb the presumption of invention which flows from the granting of every patent.

■ Consequently, I find that patent '219 and all its claims here sued upon are valid.

The plaintiffs' main attack against the validity of the third patent in suit, i. e. '567, consists of two prior art references which are reports of scientific studies, published within a decade after the discovery of polyvinyl alcohol, on certain chemical and physical properties and reactions of that material.

Halle and Hofmann's "Fiber Diagram of Polyvinyl Alcohol", published in 1935, is of interest primarily for its revelation that polyvinyl alcohol is made up of crystallites which may be parallelized by stretch (particularly easily on heating), so as to render the samples doubly refracting. The authors disclose stretching temperatures approximating those of Land and extensions up to 7,000 per cent in the heated condition and 300 to 400 per cent in the cold.

The other reference, Gallay's "The Sorption of Iodine by Polyvinyl Alcohol", published in 1936, discloses quantitatively the sorption of iodine by polyvinyl alcohol. Neither of these references teaches the application of its disclosures

to the polarization art, nor do they for that fact even mention the word "polarization". Consequently neither is in itself a complete anticipation of the patent under consideration.

Land's contribution evidenced by this patent was in taking characteristics of a material, each separately investigated and disclosed in these references, combining them and giving the result a practical application to the art of light-polarization. In so doing he came up with a commercial polarizer of high efficiency and utility which, I am convinced, represents a significant advance in the art. This polarizer is outstanding, not only for its high efficiency, but also for its case of manufacture and cheapness.

Of the three Land patents involved in this litigation, the defendant relies mainly on the disclosures of the '567 patent in conducting its commercial operations in the 3–D viewer field. It would be anomalous to strike down the patent which has proved to the defendant to have the greatest commercial value and save the other two patents. In the absence of a stronger showing by the defendant on the question of validity, this court will not reach such a result.

Consequently, I also find Patent No. 2,237,567 and the claims in issue here valid.

The plaintiffs' attack on Reissue Patent No. 23,297, is based on three prior art references which generally disclose reacting polyvinyl alcohol with boric acid for different purposes. One or more of these references describe the cross-linked nature of the resulting product and point out its new characteristics of resistance to heat and moisture. The defendant admits that the art knew that polyvinyl alcohol could be rendered water-resistant by treatment with boric acid, but it claims that additional functions are performed by this treatment when applied to its light-polarizers.

The problem which the reissue patent sought to solve was how to stabilize the sorption complex of polyvinyl alcohol and iodine so as to render it heat and moisture resistant, while at the same time bringing about the result in such a way that the polarizing properties of the sheet would not be significantly impaired. Resort was to a known means for stabilizing a basic constituent of the product, the polyvinyl alcohol. This much has been described and disclosed in the art before. However, there was no disclosure of the effect of such a reaction on a polarizing stain adsorbed on the basic material with which the cross-linking is produced. This much was unknown.

As we learn from the reissue patent for the first time the boric acid treatment does affect the polarizing properties of the sheet. "The reaction may be accompanied by some decrease in the degree of molecular orientation of the reacted layer" which in turn, in the case of iodine "may cause a loss in the transmission of the sheet running as high as from 5% to 10% of incident light". However, as the specifications read, "this decrease in transmission may in some cases be desirable, particularly for the production of light-polarizing material of high polarizing efficiency but relatively low transmission". A further change is wrought in that the predominant color of the sheet changes toward the blue. Expedients are disclosed in the patent for preventing the above-mentioned loss in transmission and for controlling the "darkening effect" resulting from the treatment. These measures are quite simple and would suggest themselves to those skilled in the art. In any case, they do not appear to constitute an essential part of the invention and accordingly they have been omitted from the claims of the patent which are all product claims.

The only other suggested innovation of the patent is that the protective layer of polyvinyl orthoborate acts to seal the iodine in the body of the sheet in the same way that it seals out moisture.

From a consideration of the patent and the prior art, I believe that those skilled in the art setting out to solve the stabilization problems posed prior to the issuance of this patent, would in due course

have reacted a polyvinyl alcohol dichroic stained polarizer with boric acid to form a cross-linked protective coating in the polarizer and that they would have observed the effect of this treatment on the polarizing stain and compensated for it where desired in substantially the same way: as disclosed in this patent. The natural effect of such a boric acid treatment would be to seal in the polarizing complex while reacting with the polyvinyl alcohol to which it is adsorbed.

 The conviction that the product of this patent would have suggested itself to those skilled in the art is fortified by a reading of the patent specifications. The disclosures are simple. No critical limitations as to time of treatment, or amounts of boric acid are specified. In short, it seems that the product of the present patent can be produced by the simple expedient of running the product of patent '567 through a bath of a concentrated solution of boric acid. Simplicity of operation does not necessarily negative invention but on the facts of this case against the background of the cited art, I believe that it shows that what the patent discloses would be obvious to a skilled chemist setting about to solve stabilization problems connected with a polarizer of the general type claimed in the '567 patent. For these reasons I find that Reissue Patent No. 23,297 is invalid for lack of invention. See Mandel Bros. v. Wallace, 335 U.S. 291, 69 S.Ct. 73, 93 L.Ed. 12.

### Determination of the question of infringement

In this part of its case the defendant alleges distinct infringements of its patents by two different polarizers manufactured by one or both of the plaintiffs over different periods of time. We shall treat first of the alleged infringements by the polarizer put out by Depix Corporation during 1953.

In the manufacture of its polarizer, Depix first mixes together in a pail certain raw material solids and solvents; i. e. Elvanel 52–22, iodine, tetraethyl ortho silicate, glycerin, and acetic acid. The mix is beat up with an egg beater and then forced by pressure through a nozzle on to the vertical surface of a glass plate which is rotating on a horizontal axis and turning very slowly in a clockwise direction. As this liquid squirts on to the plate, it completely covers the outer rim of the plate for about two feet, the excess liquid dropping off the bottom. When the wheel is rotated for about ten degrees, heat lamps in the apparatus at this point dry the film, causing the solvent to evaporate. The film is then stripped off the wheel, stretched out and applied to a cellulose acetate backing. It then passes through a drying tower, where it travels up and down several times to dry the rest of the solvent out. After that it is wound on a wheel, the process being completed.

Samples of the product produced by this process were delivered to the defendant early in the litigation for test purposes. The defendant's expert witnesses, Dr. Blout and Professor Mark, conducted many extensive tests on the accused polarizer. Their findings, fully documented and explained, are in evidence and constitute the basis of the defendant's counterclaim.

Without describing the tests specifically, I find them impressive, both in number and kind. They have been conducted by experts in the field with great care and attention to detail, who have not been content to rest their important findings on a single isolated test, but in the best scientific tradition have run complementary tests to support and confirm their conclusions. The nature of the tests performed were described at length to this court and the results obtained are fully explained and documented by numerous physical exhibits. These tests stand as the sole tests on the plaintiffs' product before this Court and I am disposed to accept them and the conclusions of the experts based upon them in the absence of a serious attack upon their validity. Dr. Mark summarized, and I adopt this summary as a fact, that the accuracy and reliability of all the various tests, namely, the infrared absorption

spectrum, the swelling and solubility, the contradiction upon swelling, the chemical analysis by combustion, the Zerewitinoff determination of free hydroxyl groups, the qualitative establishment of the presence of iodine and the various X-ray tests permits the following conclusion: the polarizing film in the Depix sheet is a molecularly oriented linear high polymer, specifically a polyvinyl alcohol comprising a sorption complex of iodine on it and containing about 2% silicon, either unbonded or partially bonded to the polyvinyl alcohol. The sheet is an efficient light polarizer. It is under internal strain, which can be released by swelling, upon which the sheet relaxes to one third or one fourth of its stretched length, parallel to the direction of the stretch.

Various attacks made by plaintiffs on these tests proved fruitless. The tests have proved that the Depix film is essentially polyvinyl alcohol complexed with iodine. If this is the reaction which makes polarization possible, then the addition of other chemicals to the sheet in minor proportions would not excuse the plaintiffs from a charge of borrowing from the defendant's patents.

The plaintiffs' defense to the charge of infringement was twofold. It consisted in the first place of an attempt to impeach the accuracy and reliability of the defendant's tests.

The second part of the defense was furnished by the plaintiffs' expert witness, Dr. Beckmann, who testified to limitations in every claim of the Land patents by which infringement would be avoided.

Dr. Mark had previously furnished testimony on each of the claims in suit which, if accepted by this Court, would require a finding of infringement thereof by the plaintiffs' product or process.

The disagreement between the experts on each side is one more of form than of substance. The testimony of the plaintiffs' expert, Dr. Beckmann, does not cover as many separate and distinct limitations as there are claims in the patents, but relates rather to one or two

basic limitations to each of the three patents in suit. Having considered all of the evidence on both sides carefully, I am of the opinion that the Depix polarizing layer is a linear plastic; that the Depix layer is extended in a rubber-elastic condition; and that the layer is properly characterized as a vinyl compound within the meaning of the term as used in the patent. In other words, I conclude that by the use of the words "vinyl compound" in the patent, it was meant to include, and was synonymous with, a polyvinyl compound. This construction is in accord with cases holding that a patentee may define his own terms regardless of common or technical meaning and his definition should be accepted in construing the patent. Dennis v. Pitner, 7 Cir., 106 F.2d 142; Lewis Invisible Stitch Mach. Co. v. Columbia Blindstitch Mach. Mfg. Corp., D.C., 22 F.Supp. 705; Moss v. Patterson-Ballagh Corp., D.C., 89 F.Supp. 619. See also Stuart Oxygen Co. v. Josephian, 9 Cir., 162 F.2d 857, 860, where the court says at pages 860–861:

"Moreover, it is well recognized that an uncommon word used in the claims is to be construed in the light of its usage in the description or other portion of the patent rather than to limit it to its dictionary meaning."

On the basis of the combined testimony of the defendant's experts, I find that the Depix product is essentially polyvinyl alcohol complexed with iodine, which also contains about 2% silicon either free or bonded to the polyvinyl alcohol and possibly 5% of glycerine which may serve as a plasticizer. No tests have been offered by the plaintiffs to refute or contradict this analysis of the composition of the Depix product. The only figure seriously questioned by the plaintiffs is that submitted by Dr. Blout for the glycerine content of the product. From a consideration of the evidence on this question, I accept the conclusions of Dr. Blout. But even allowing the possibility of a larger percentage of glycerine in the final product,

I still feel that the result would be the same, for I am convinced that the role glycerine plays in the product is minor. It does not contribute to the polarization effect. It does not react with or change the essential chemical characteristics of the ingredients which do. It is present solely as an additive or filler which might also act as a plasticizer. In like manner the role of silicon in the accused product is limited. The small percentage present does not appreciably change the chemical, physical or optical properties of the product so as to constitute a significant departure from the '567 patent claims.

For these reasons, I find that the presence of the glycerine and silicon in the Depix product together with materials claimed by Land does not result in a product sufficiently distinguishable for the product claimed in the patent claims so as to avoid infringement thereof.

See cases holding that the addition of other substances to those claimed in the patent does not avoid infringement where such additional substances are not shown to radically change the composition of the patent, I. F. Laucks, Inc., v. Kaseno Products Co., D.C., 59 F.2d 811; Aluminum Co. of America v. Thompson Products, D.C., 25 F.Supp. 175; Union Carbide & Carbon Corp. v. Graver Tank & Mfg. Co., D.C., 106 F.Supp. 389.

 With these main points of difference between the experts settled, and other issues in the case resolved, I now find on the basis of all the evidence in the case substantial infringement of the claims of all three Land patents in issue by the Depix product and process.

Specifically I find infringement of: Claims 17 and 18 of Patent No. 2,454,515. Claims 1, 2, 3, 4, 5, 6, 20, 22 and 24 of Patent No. 2,328,219. Claims 1, 2, 5, 7, 8, 9 and 18 of Patent No. 2,237,567.

The evidence is insufficient to support a finding of infringement of claim 11 of Patent No. 2,454,515.

 I am convinced that Marks participated sufficiently with the corporation in the infringement of the defendant's patents to hold him personally liable for such infringement. As the evidence shows, Marks was president of Depix from its inception until a day before it discontinued the manufacture of polarizers. Depix was a small family corporation organized by Marks and his brother. The latter two together with their mother were the only officers in the corporation and the three owned all its stock through ownership of another corporation which in turn held the stock of Depix. Marks supervised and directed the building of machines and equipment used by Depix in manufacturing its commercial product. He was thoroughly familiar and conversant with the detailed process employed by Depix and the resulting product and he was the patentee of the patents under which Depix allegedly operated and for the exploitation of which it was incorporated. Marks disclosed in his deposition that he and his family invested considerable funds of their own in Depix and that this was the only source of revenue of the corporation outside of sales returns and certain deposits advanced by another company which acted as distributor in the sale of viewers.

These facts and others show that Marks participated actively in the business of the corporation and that but for his direct contributions, the infringement complained of here would never have resulted. Accordingly, I find this plaintiff a guiding spirit behind the infringement and hold him personally liable with the corporation for its occurrence. See Calculagraph Co. v. Wilson, C.C., 132 F. 20; Federal Trade Commission v. Standard Education Soc., 2 Cir., 86 F.2d 692; General Electric Co. v. Wabash Appliance Corp., 2 Cir., 93 F.2d 671; General Motors Corp. v. Provus, 7 Cir., 100 F.2d 562; Dean Rubber Mfg. Co. v. Killian, 8 Cir., 106 F.2d 316.

 I find insufficient evidence to support a charge that the plaintiff, Marks, individually or through some company dominated by him, infringed the first two Polaroid patents in the period from 1948 to 1952. The addi-

tional defenses to the counterclaim advanced by the plaintiff merit little consideration. They are to the effect that (1) false representations were made by Land to the Patent Office of a very excessive dichroic ratio; and (2) that the defendant misused its patents. It is quite true that a misrepresentation of a dichroic ratio to the order of 25 was made which was probably stretching it beyond the limit of actual fact. But from a broad consideration of the file wrapper of the patent as a whole, I believe that the statement complained of, although factually untrue, was not the result of a deliberate attempt to falsely represent the facts. I find that it did not deceive or mislead the examiner in his consideration of the patentability of the application pending before him. See United States v. Cold Metal Process Co., D.C., 62 F.Supp. 127, 140; Becton-Dickinson & Co. v. Robert P. Scherer Corp., D.C., 106 F.Supp. 665.

■■ But even if this representation was serious, which I feel was not the case, it still would not serve as a basis for action of this Court invalidating the patent as requested by the plaintiffs. Cancellation of patents for misrepresentation in procurement must be initiated by the United States itself; Dimet Proprietary v. Industrial Metal Protectives, D.C., 109 F.Supp. 472; Hazel-Atlas Glass Co. v. Hartford Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250.

In a proper case a patentee's misrepresentation might justify a court in denying relief to the plaintiff in a suit for infringement. But for the reasons stated above I do not find this to be such a case.

As to the charge of misuse of the patent, evidence in the case shows that the defendant corporation has sold its viewers, both the permanent and temporary types, to its distributors and other retail outlets with notices or invoices attached to the cartons containing the viewers placing certain restrictions on their use and resale. The temporary or disposable viewers came to the various theatres through the defend-

ant's distributor with the notice that for sanitary and other reasons the viewers were to be used once only and must then be destroyed.

The permanent type viewers were sold to certain companies which manufacture stereoscopic equipment for amateur use and sell the viewers to their customers as part of a kit with a stereoscopic projector. The evidence is uncertain as to whether this type viewer is sold independently of the other equipment offered by these manufacturers, and also as to whether it can be procured at other outlets. A condition of the sale of these viewers imposed by Polaroid was that they not be used or resold for use in admission-charging theatres.

In his deposition testimony Land sought to justify the above restrictions or conditions of sale as applied to both types of viewers on the grounds of certain health hazards. He explained that the terms of the invoice attached to the permanent viewers were not intended to prohibit their use in a theatre by an individual who has purchased the viewer from a retailer, but was intended to apply mainly to the case of a resale by the retailer to the theatre directly, in which case the same health hazard would exist as in the case of the disposable viewers.

I am convinced that the reuse of these viewers, both the permanent and temporary ones, in theatres provides grounds for a rational fear of infection and the spread of disease and that the defendant might well have felt itself compelled to take measures to guard against this danger. On the other hand, it is a fact that the measures taken by the defendant do guarantee an expansion of their business, and for this reason might come within the principles enunciated by the courts prescribing any attempt to enlarge the monoply granted by the patent laws.

■■ However, on the facts of this case, where there appears to be present countervailing public policy considerations, I cannot hold that the practices employed by the defendant in connec-

tion with the sale of viewers constitute such a misuse of patents as to compel this Court in good conscience to deny the defendant relief on its counterclaim.

### Validity of Trademark

The defendant charges' that the adoption and use by plaintiffs on their stereoscopic viewers of the trademark "Polalite" infringes its trademark registration, Ser. No. 388,721, issued July 8, 1941, for the trademark "Polaroid" for stereoscopic viewers and the like.

The defendant alleges that it has spent large sums of money in advertising and exploiting its products and the trademark "Polaroid" and that the unauthorized use by the plaintiffs of the confusingly similar trademark "Polalite" upon goods of the same kind as those sold by the defendant under its trademark has already caused and will continue to cause confusion and deception of the trade and public unless restrained by this Court.

Plaintiffs' answer to this count of the counterclaim admits their use of the word "Polalite" on their viewers but denies that such use constitutes infringement of a valid trademark of the defendant, and asserts that in any case, the defendant's counterclaim must be dismissed because of certain defenses which we shall consider presently.

The record in this case shows that the trademark "Polaroid" was first adopted by defendant's predecessor, Sheet Polarizer Company, Inc., in November of 1935. Since that time this trademark has been applied first by Sheet Polarizer and subsequently by Polaroid Corporation to numerous products made and sold by those companies. Some fifteen different United States registrations of the mark "Polaroid" have been obtained by the defendant and its predecessor commencing in August 4, 1936, and terminating in September 15, 1953.

Until the fall of 1948, when the defendant first began to market the Polaroid Land Camera, the bulk of the products produced by Sheet Polarizer and the defendant were products incorporating light-polarizing materials, such as light-polarizing sheets, desk lamps, sunglasses, optical filters, polariscopes and stereoscopic viewers. However, at least as early as 1935, the defendant's predecessor, Sheet Polarizer, had applied the trademark to products which contained no polarizing material, such as eyeglass and filter cases, wave-retardation plates, and laboratory outfits. In November of 1948 the defendant began to market the Polaroid Land Camera and has since then applied its trademark to cameras, film, light meters, flashguns, camera cases, copy devices, photographic albums, etc.

The history of the sale and trademarking of stereoscopic viewers by the defendant and its predecessor dates back at least to 1936. At first sales were minor, but commencing in 1939 a large demand for viewers was created at the New York and San Francisco World Fairs where three-dimensional motion pictures were shown. From 1939 through 1940, the defendant sold between four and five million viewers.

The defendant's total sales for polarizing materials and products comprising polarizing materials from 1937 to the end of 1953, amount to $48,500,000. This is to be compared with a figure of $122,488,060, which represents total overall sales for the various products of the defendant during the same period of time. The total amount spent in advertising all products of the defendant from 1937 through 1953 equals $4,470,000. Of this figure $801,000 was spent in advertising products comprising light polarizing materials.

The plaintiffs' first contention is that the defendant's trademark is invalid, since it was not the proper subject for a trademark to begin with because it is only descriptive of the products to which it is applied.

The plaintiffs argue that the word "polar" is a dictionary word common to the trade and the suffix "oid" is a common suffix meaning like, resembling, in the form of, etc. Consequently, rea-

son the plaintiffs, when the two are added to form a word, the result is a descriptive noun or adjective as applied to light-polarizing materials, which cannot be exclusively appropriated by the defendant.

The plaintiffs have failed to show, however, any use in the trade of "polar" except as a root for other words such as "polarize", "polarizer", "polarization".

Further, I find that the right to the exclusive use of the word "polaroid" by the defendant initially did not entail danger of impoverishment of the language in the sense that it unduly restricted competitors of the defendant in describing their products. See Telechron, Inc., v. Telicon Corp., 3 Cir., 198 F.2d 903. In this sense, a coined word has practical advantages as a trademark since exclusive use of it ordinarily deprives no one of any rights which he may possess.

In the present case there is evidence that other manufacturers of synthetic light-polarizers sold their products under trademarks such as "Herotar", "Bernotar" and "Magic-Vuers". There is no evidence that any such manufacturers have ever adopted the trademark "Polaroid".

■ On this phase of the case I hold that the trademark "Polaroid", as originally adopted and used, was a valid trademark as a coined or invented symbol; that while it might be somewhat suggestive of the nature of one or more of the articles to which it was applied, still it was not void for descriptiveness as contended by the plaintiffs here.

In their answer to the counterclaim the plaintiffs allege that the term "polaroid" has acquired a generic meaning and has become the designation of a class of products accomplishing polarization of light and no longer identifies the source of any particular product.

■ Again the plaintiffs claim that the defendant has dedicated its trademark to the public by: (1) early use of the mark in a generic sense to describe its polarizers in certain advertisements appearing in 1936 and 1937; (2) approving and indirectly paying for certain advertising copy of local motion picture exhibitors during 1953 and early 1954, in which "Polaroid" is again used in an alleged generic sense. I find the evidence offered by the plaintiffs insufficient to sustain this latter charge.

On the showing made by the plaintiffs on the question of loss of distinctiveness of the trademark, one would have to be blind to deny that there has been a widespread generic use of the word "polaroid". This use has been so widespread in fact that it has found its way to the lexicographers, though most dictionary definitions quoted also recognize that the word is a trademark. It is further evident that the use of "polaroid" as a common noun has extended to stereoscopic viewers as well as to polarizing material in other applications.

■■ As I view the cases, a defendant alleging invalidity of a trademark for genericness must show that to the *consuming public as a whole* the word has lost all its trademark significance. That such is the burden placed upon a defendant in cases like this one seems evident from the courts' findings and dicta in Du Pont Cellophane Co. v. Waxed Products Co., 2 Cir., 85 F.2d 75, and Bayer Co. v. United Drug Co., D.C., 272 F. 505. But I cannot find that the trademark "Polaroid" has come to be so public and in such universal use that nobody can be deceived by the use of it. Where the possibility of some deception remains real and the need of competitors to satisfactorily describe their products is satisfied by the availability of several common nouns or adjectives suitable for that purpose, this Court will protect the interest of the owner in his trademark.

For these reasons, I conclude that the plaintiffs have failed to sustain their defense that the defendant's trademark is invalid for loss of distinctiveness among the trade and consuming public.

■ The fact that the defendant's patent on "J-Sheet" (an early polarizer to which the defendant also applied its

trademark) expired some time ago, does not change the result reached above. On this subject the American Law Institute's Restatement of Torts, Vol. 3, § 735, comments, "It is not by the expiration of the patent—but by the change of meaning in the market, that such a designation ceases to be a trademark under the rule stated in this Section. * * * The existence of the patent is simply a circumstance which may facilitate the change of meaning in the market." See also Ross-Whitney Corp. v. Smith Kline & French Laboratories, 9 Cir., 207 F.2d 190 and cases cited therein. Since the plaintiffs have failed to otherwise show to the satisfaction of this Court a trade or consumer identification of the defendant's trademark with stereoscopic viewers or polarizing material manufactured under the "J-Sheet" patent as distinguished from such an identification with a source of manufacture, the expiration of this patent by itself does not affect the validity of the trademark.

The plaintiffs claim that even though "Polaroid" is a valid trademark, the defendant is precluded from suing for its infringement because of delay on defendant's part to sooner enforce its rights which amounts to an estoppel. In view of the result we reach on the question of infringement, we deem it unnecessary to consider this defense.

### Infringement

The question of infringement is a fact question the resolution of which depends ultimately on the court's finding whether a defendant's use of his designation is likely to result in confusion of the consuming public as to the source of the goods in question: See Dwinell-Wright Co. v. National Fruit Product Co., 1 Cir., 140 F.2d 618.

The courts often accord much weight to evidence showing actual instances of confusion on the theory that if consumer confusion has already occurred to an appreciable extent, then its likelihood of again occurring in the future is real. The defendant has attempted to invoke the same reasoning in the present case by introducing in evidence several instances of alleged consumer confusion. In this attempt the defendant has failed. The evidence is simply insufficient to support a finding of consumer confusion. The evidence proffered is without weight or probative force to establish actual confusion. In the first place, it does not show the reactions of the pertinent market: the buyers and sellers of stereoscopic viewers. Then it does not show the type of confusion which the defendant may complain of; i. e. confusion caused by the plaintiffs' unlawful simulation of a mark owned by the defendant. For I am convinced from an inspection of the newspaper articles and the commercial report that their use of "Polaroid" is in a generic or descriptive sense. The evidence in question undoubtedly shows confusion of a sort. However, the issue here concerns not the fact of confusion, but only its precise cause.

From a review of the defendant's evidence on this phase of the infringement action, I must find that it has failed to establish that a single customer dealt with the plaintiff under the misapprehension that he was dealing with the defendant.

This is not fatal to the defendant's case, since a showing of instances of actual confusion is not essential to establish a cause of action for trademark infringement.

In cases involving a colorable imitation or simulation of a trademark as distinguished from an outright appropriation of the trademark in its entirety, courts must decide whether what the defendant has taken is enough to enable him to practice deception and feed on the trade of a competitor. In the present case the plaintiffs have availed themselves of the first four letters of the defendant's trademark. "Polar" is a dictionary word and a combining form. The defendant has employed it in its trademark as a root to which there was added the common suffix "oid". The plaintiffs have made the same use of

"polar" except for the "r", and they have also added a common suffix, "lite". Both trademarks as finally devised are composed of eight letters. The dissimilarities as noted above are quite different suffixes and the omission of an "r" in one case. When both marks are placed in juxtaposition and compared with a view to discovering the similarities and differences between the two, it is evident that the latter are more than adequate to distinguish between the two. However, this is not the final test in determining infringement. It is not enough to subtract from each mark the parts which are common and then to compare the balance. In Pre-Phy-Lac-Tic Brush Co. v. Jordan Marsh Co., 1 Cir., 165 F.2d 549, 552, the court says "in determining whether given trade-marks are so similar as to be likely to cause confusion in the minds of consumers as to the source of the goods upon which they are used it is not enough merely to compare the sounds of the words which may be used as trade-marks, or to compare those words letter by letter and syllable by syllable, or even to make merely a side by side visual comparison of the words in the setting in which they are employed".

■■■ Consideration should be given to the impression created by each mark as a whole. What counts is the ensemble. However, in arriving at a conclusion courts often make allowance for the fact that purchasers rely upon memory and somewhat vague or indefinite impressions when selecting a commodity. The passage of time might erase in their minds certain features of a trademark such as common suffixes, while they retain other features which are dominant or salient. So we should endeavor to " 'determine * * * the purchasing public's state of mind when confronted by somewhat similar trade names singly presented'." Albert Dickinson Co. v. Mellos Peanut Co., 7 Cir., 179 F.2d 265, 270.

Just as first names in trademarks composed of two or more words catch the eye and ear, Bunte Bros. v. Standard Choco-

lates, D.C., 45 F.Supp. 478, so too do first syllables or roots (even where incompletely copied) in one-word trademarks often impress themselves on the senses. A purchaser having a "Polaroid" product in mind from having seen or heard the defendant's advertising, might possibly assume when he saw a "Polalite" product that his memory was playing him false and that in fact it was the latter product he has earlier heard or seen advertised. Pre-Phy-Lac-Tic Brush Co. v. Jordan Marsh Co., supra.

■■■ Under the established tests for determining infringement on the basis of the words themselves, absent other considerations, a finding of infringement in this case might be proper. However, it is not the tendency of words to confuse as such which is paramount, but their tendency to confuse a specific market. Accordingly the relative similarity of the trademarks should be studied in the light of the manner in which the goods are sold and the habits of the ordinary consumer. See Nims on Unfair Competition and Trade-Marks, Vol. I, Section 221d.

In the instant case, under the business practices adopted by both parties, viewers were customarily sold through distributors to motion picture exhibitors. It is evident that each purchaser required a large supply of viewers; enough to equip every spectator who attended a performance at his theatre. Even though the cost of a single viewer is relatively low, still in the bulk the outlay for a single purchase to supply an audience for one showing of a three-dimensional feature might be considerable. Allowing for the fact that the cost might be passed on to the spectator by raising admission prices, still the theatre manager or owner would feel himself compelled to discriminate between different makes of viewers since an inferior batch could destroy the three-dimensional effect and result in complete technical failure of the movie. The resultant patron dissatisfaction and protest could seriously affect the theatre's business and good will.

Add to this the fact that we can expect the average exhibitor to be somewhat more discerning to begin with, since he is in business himself and like other business men presumably pays more attention to details and inspects more closely than the layman purchaser.

These factors point to an alert, discriminating consumer market which would not be easily duped by a similarity in trademarks employed by competing sellers of stereoscopic viewers. In the absence of relevant evidence showing that this has happened in the past, I believe it most unlikely that there is more than a remote possibility of confusion in the future.

 For these reasons I find that the plaintiffs' use of "Polalite" as a trademark does not constitute an infringement of the defendant's registered trademark "Polaroid". This finding also disposes of the defendant's count for unfair competition.

Accordingly, the defendant's counterclaim must be dismissed insofar as it charges trademark infringement and unfair competition.

### Conclusions of Law

From the foregoing:

1) I conclude and rule that the Marks Patent No. 2,104,949 is invalid for want of novelty.

2) I conclude and rule that Marks Patent No. 2,104,949 is also invalid on the grounds of prior public use more than two years before the application for the patent was filed.

3) I conclude and rule that Claim 9 of the Marks Patent No. 2,199,227 is invalid for want of novelty.

4) I conclude and rule that Claim 11 of Marks Patent No. 2,199,227 is valid.

5) I conclude and rule that even if the Marks Patent No. 2,104,949 and Claim 9 of Marks Patent No. 2,199,227 were valid, they are not infringed by the accused process or product of the defendant.

6) I conclude and rule that Claims 11, 17 and 18 of Land Patent No. 2,454,515 are valid.

7) I conclude and rule that Claim 12 of Land Patent No. 2,454,515 is invalid.

8) I conclude and rule that Land Patent No. 2, 328,219 and all the claims sued upon are valid.

9) I conclude and rule that Land Patent No. 2,237,567 and the claims sued upon are valid.

10) I conclude and rule that Reissue Patent No. 23,297 is invalid for want of invention.

11) I conclude and rule that Claims 17 and 18 of Land Patent No. 2,454,515 are infringed by the plaintiffs.

12) I conclude and rule that Claims 1, 2, 3, 4, 5, 6, 20, 22 and 24 of Land Patent No. 2,328,219 are infringed.

13) I conclude and rule that Claims 1, 2, 5, 7, 8, 9 and 18 of Land Patent No. 2,237,567 are infringed.

14) I conclude and rule that the use by the plaintiffs of the name "Polalite" does not infringe the defendant's trademark "Polaroid".