Alvin M. MARKS, Plaintiff, Appellant,

v.

POLAROID CORPORATION,
Defendant, Appellee.

No. 5055.

United States Court of Appeals
First Circuit.

Heard March 7, 1956.
Decided Sept. 26, 1956.

Floyd H. Crews, New York City, with whom Harvey W. Mortimer, and Darby & Darby, New York City, were on the brief, for appellant.

Donald L. Brown, Cambridge, Mass., with whom Rowland V. Patrick, Boston, Mass., Julius Silver, New York City, Charles Mikulka, Cambridge, Mass., Fish, Richardson & Neave, Boston, Mass., and Silver, Saperstein & Barnett, New York City, were on the brief, for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

WOODBURY, Circuit Judge.

Alvin M. Marks as the owner of two United States patents, Nos. 2,104,949 and 2,199,227, and Depix Corporation as his exclusive licensee, brought suit in the court below against Polaroid Corporation for infringement of several claims of the patents. Polaroid answered and filed a counterclaim charging both plaintiffs with trademark infringement, unfair competition, and infringement of enumerated claims of three United States patents issued to it as the assignee of Edwin H. Land and a reissue patent which it owned. These patents are No. 2,237,567, issued April 8, 1941; No. 2,-328,219, issued April 31, 1943; No. 2,-454,515 issued November 23, 1948; and Reissue No. 23,297, issued November 28, 1950. The plaintiffs replied with a prayer for a declaratory judgment of

invalidity of all four of the defendant's patents.[1]

The District Court after hearing entered a judgment in accordance with its opinion wherein it dismissed the plaintiff's complaint for infringement on the ground that the claims sued upon were either invalid or had not been infringed by the defendant. And it also dismissed the defendant's counterclaim insofar as it charged the plaintiffs with trademark infringement and unfair competition. It held, however, that some of the claims of the three Land patents remaining in issue under Polaroid's counterclaim were valid and infringed by Depix Corporation, and that Alvin M. Marks was personally liable for that infringement. Wherefore it enjoined both plaintiffs from further acts of infringement and referred the issue of damages to a master. Both Marks and Depix Corporation appealed, but the appeal of the latter was dismissed for want of diligent prosecution leaving Alvin M. Marks the sole appellant. In that role he does not contest the judgment below insofar as it adjudicates the claims of his patents in issue either invalid or not infringed. His position is that the court below erred in holding any of the claims of the Land patents in issue valid and infringed, that the patents themselves are invalid and unenforceable because obtained by fraud on the Patent Office, that they are unenforceable because they have been misused, and that in any event he is not personally liable for any infringement by Depix Corporation.

The Land patents with which we are concerned are in the light polarizer field and they cover both a product and a process. The plaintiff-appellant in his brief says: "The disclosures of all three may be stated very briefly as being simply to make a polarizer from a sheet of plastic by stretching it, holding it stretched until it is set so that it will not contract, and staining it with a dye at some stage of the process." This general statement can serve only as the barest of introductions. The problem is a complicated one and to understand it and the conflicting arguments of the parties some exposition of the general principles involved must be attempted.

Oversimplification has its dangers, particularly for tyros. But there is no way of escape for us here, so with no little trepidation we embark on the risky venture of stating in a general way our understanding of the phenomena involved.

The appellant says in his brief, and we do not understand the appellee to disagree, that according to present scientific theory, light consists of vibrations in every direction in a plane perpendicular to the direction of travel of a light beam. That is, if a beam of light coming toward an observer be thought of as the hub or axle of a bicycle wheel coming broadside toward the observer, i. e. with the hub pointed directly at the observer so he could see through it, the vibrations would be represented by the spokes of the wheel.

Now when a beam of light strikes a reflector, such as a polished metal surface, the beam bounces off at an angle equal to the angle of its approach. (The angle of incidence equals the angle of reflection.) This is simple reflection. When a beam of light strikes a transparent object at an angle, such as a pane of glass, it meets resistance, is slowed down and thereby deflected, so that as it enters the glass it turns at an angle and as it emerges from the other surface of the glass it again turns at an angle and resumes its original direction. That is to say, the beam takes a zig-zag course through the glass. This is refraction.

Certain transparent crystals have a different effect upon a beam of light. These crystals, like glass, offer resistance

[1]. During the trial the defendant withdrew its charge of infringement of the reissue patent but the issue of its validity remained in the case under the plaintiff's prayer for declaratory relief. The court below resolved that issue against the defendant but since it has not appealed we need not consider the validity of that patent.

to the beam of light but, unlike glass, because of their molecular composition, the vibrations in one plane, say the plane horizontal to the surface of the earth represented in our simile by the horizontal spokes of the bicycle wheel, meet less resistance than the vibrations in the vertical plane represented by the up-and-down spokes of the bicycle wheel. Thus the vibrations roughly in one plane are slowed down more than the vibrations roughly in the other, with the result that two beams of light emerge from the crystal, one having vibrations generally in one plane and the other having vibrations generally in the plane at right angles with it. This is double refraction or birefringence.

Polarization is one step beyond birefringence in that the vibrations in one plane are to a large extent absorbed by the crystal so that only a single beam of light emerges from it and the vibrations in that beam are largely in a single plane. That is to say, a polarizing crystal not only divides an ordinary beam of light, like a birefringent crystal, into two beams, one having vibrations largely in one plane and the other having vibrations largely in the plane at right angles to it, but also largely absorbs the vibrations in one plane. Thus, if a perfect polarizer existed it would cut off all light except that vibrating in a single plane, and if two such polarizers were placed in the path of a beam of light with their planes of polarization at right angles to one another, all light passed by the first polarizer would be cut off by the second and no light at all would pass through the latter.[2]

Dichroism is another name for polarization, and the dichroic ratio, or dichroic constant as it is sometimes called, is a measure of the amount of light that gets through a polarizer and therefore a measure of its merit. The higher the dichroic ratio the better the polarizer.

The phenomenon of polarization has been known for at least a century and a half. At first only natural polarizers, such as the Nicol prism and tourmaline, were known, and they were expensive. About one hundred years ago a British scientist named Herapath had some success in manufacturing synthetic polarizing crystals which came to be known as herapathites after their discoverer, but they were slow to make, small in size and expensive, and so never attained commercial success.

This was the state of the polarizer art until the late 1920's when two precocious young scientists in their teens, the plaintiff Alvin M. Marks and the defendant's patentee, Edwin H. Land, almost simultaneously entered the field. The interest of both young men stemmed from their interest in television, and each, independently and without knowledge of the other, started with Herapath and following his teaching attempted to develop synthetic polarizers of large area. Both failed, and then each struck out on a path of his own. Marks continued to follow Herapath's teaching in a general sort of way, but since the validity of his patents is no longer in issue we need not at this point trace the development of his work. Land, on the other hand, became convinced that any process involving the growth of large crystals along the lines taught by Herapath for growing small ones could never be commercially successful because it would take too long. It then occurred to him that the ideal material for cheap synthetic polarizers of large size would be a transparent plastic which could be obtained in great rolls, for such a material is well adapted for the purpose because it is composed of molecules of relatively enormous size in a single direction, that is, long, thin,

2. In IES [Illuminating Engineering Society] Lighting Handbook, First Edition, 1947, Section 7–15, Polarization is described as follows: "Light waves emitted by common sources are oriented at all angles in planes at right angles to the direction of the beam emitted from a source. As they pass through certain substances or are reflected from certain surfaces at particular angles, vibrations in some directions are absorbed more than are those in other directions. Light which vibrates more strongly in certain directions is said to be polarized."

needle-shaped molecules. Its molecular weight is heavy; it is a linear high polymer so called.

In their ordinary state these long, thin, heavy molecules of which plastic materials are composed entwine themselves around one another, it is said "like spaghetti." But when the plastic material is stretched the molecules tend to realign themselves more nearly parallel and the greater the stretch the more nearly parallel the molecules become. Land's first idea, embodied in a patent now expired and not in issue, was to grow exceedingly small herapathites, which did not take long, embed them in a transparent plastic carrier and, by extruding the plastic containing the submicroscopic needle-shaped herapathite crystals through small apertures, set up a mechanical stress in the extruded material which caused the crystals embedded in it to orient themselves in parallel alignment, as the District Court said, just as logs floating down stream tend to travel along butt end first.

Polarizers made according to the teaching of this patent were apparently at least moderately successful, but Land soon began to experiment with a new type of polarizer using Cellophane and a direct dye or stain which had the property of absorbing light vibrations in a single plane. The District Court described this departure from prior practice as follows [129 F.Supp. 247]:

"Rolls of cellophane were swelled, stretched, and run through an iodine bath. Difficulty was encountered, however, with this process because the iodine was fugitive and would not stay in the cellophane sheet. Land experimented with different kinds of plastics and finally hit upon the complex of iodine with polyvinyl butyral. Immediately he shifted from polyvinyl butyral to polyvinyl alcohol and developed his "H sheet" which is made by taking a large roll of polyvinyl alcohol, heating and stretching it to orient the molecules,

then affixing it to an unstretched backing of cellulose acetate, and floating the supported film of polyvinyl alcohol upon the surface of a bath containing a solution of iodine. A fourth step is employed in which the sheet is run through a bath of boric acid, which stabilizes the film and drives out excess iodine." [3]

Applications for patents covering these new Land products and processes were filed on October 29, 1938, and on May 4, 1939. The earlier application became involved in an interference and was ordered divided in accordance with Patent Office procedure. While the interference was pending, patent No. 2,237,-567 issued on April 8, 1941, on the May, 1939, application. The other two patents, No. 2,328,219 and No. 2,454,515, issued on the earlier divided application of October, 1938, the first patent on August 31, 1943, and the second patent November 23, 1948. It will be convenient to follow the District Court's lead and start with consideration of the two patents which issued last, but on the earlier divisional application.

The specifications of these two patents are substantially identical but the later of the two, referred to by the District Court as the '515 patent, is the broader. It covers transparent, linear, high polymers, such as a sheet of a cellulostic compound, as for instance cellulose acetate or ethyl cellulose, or regenerated cellulose, or a sheet of a vinyl compound, such as a plasticized vinyl acetate resin, as the preferred materials to be used, whereas the materials claimed in the earlier '219 patent are less general being limited to the transparent vinyl compounds, with some of its claims limited still further to a vinyl acetate resin or to a polyvinyl butyral.

The District Court found, and as we understand the briefs and arguments the parties agree, that both of these patents cover a new and better light polarizer, and a process for making the same, the process consisting of rendering the plas-

---

3. This fourth step is covered by the reissue patent which is no longer in issue.

tic "rubber-elastic" by some appropriate means, as by heat or a solvent, stretching it while in that state substantially to the limit of its extension, then holding it in its stretched or extended position or setting it in that position so that the alignment of its needle-shaped molecules in substantial parallelism set up in the sheet by stretching it is retained, and at some stage in the process dyeing the plastic sheet either by a direct cotton dye, a suitable mordant dye, iodine, bromine, or a metal, such as mercury, silver, gold or copper.

The District Court found that Land was not the first broadly to teach the art how to manufacture this kind of polarizer. Analysing the references it found that others prior to Land had taught how to make polarizers by stretching the same kind of materials used by Land, i. e. transparent linear high polymers, to orient their needle-shaped molecules to substantial parallelism, and staining the material at some stage of the process with the same materials suggested by Land, i. e. direct cotton dyes, iodine or metallic elements. But it found that the "key" to the Land invention covered by these two patents lay in the disclosure of putting the various plastic materials employed in a "rubber-elastic" state and while in that state stretching them "to the limit of their extension." It found that Land treated "as critical and the secret to making better polarizers of this kind both a reduction of the polymeric material to a particular state or condition of physical behavior prior to stretch and a particular type of stretch while in this state." [129 F.Supp. 261.] This, it found, had not been taught or clearly suggested in the references and constituted an advance over the prior art which amounted to invention. Wherefore, finding that invention lay in these two features alone ("rubber-elastic" state and stretch to "limit of extension") it held valid only the claims in issue drawn in such a way as to include one or both of these features, either expressly or by necessary implication.

The appellant's principal and basic contention can be stated in a nutshell. His counsel says in his brief that the District Court "was in error in believing that using the words 'rubber-elastic' and 'limit of extension' represented any contribution or advance in the art." And then he adds: "No plastic has ever been stretched in any condition other than when plastic enough to be stretched, and 'rubber-elastic' does not describe any condition other than this." A careful study of the testimony in the record appendixes and the exhibits convinces us that counsel is wrong in both assertions. We shall consider them in the inverse order of their statement.

Land in the specifications of the two patents we are considering defines the term "rubber-elastic" as he uses it therein. The definitions are not verbatim the same but we cannot see that the differences in their phraseology have any significance in this litigation. The definition in the '515 patent is as follows:

"The term 'rubber-elastic state' as used herein is intended to describe an elastic condition which is closely similar to the elasticity possessed by vulcanized or cured rubber. It is intended to describe a condition in which the plastic may be stretched or extended an appreciable amount without permanent distortion or alteration in the structure of the sheet. Hence it is intended to describe a condition such that when the stress or strain is relieved the sheet tends to return to its original form and shape. It is intended to describe such a condition where that condition is inherent in the material, for example in plasticized vinyl acetal resin, or is acquired by the material when it is in a heated condition, for example in the case of unplasticized vinyl acetal resin, or when it has been subjected to a swelling or wetting agent, for example Cellophane wetted with an aqueous solution of sodium hydroxide."

The appellant's argument seems to be that the term "rubber-elastic" as so de-

fined has no meaning because plastics cannot be stretched in any other condition. That is, the argument runs, if plastics are stretchable as called for in the patents then they must of necessity be "rubber-elastic," for if not in that condition they must be "solid," and in that condition unstretchable. Wherefore it is said that the term "rubber-elastic" adds "nothing whatever except confusion." Indeed it is suggested that use of the term involves a "sham" which was completely exposed by the testimony of Polaroid's expert witness who, it is asserted, testified at one point that plastics could only be stretched when they were in a "rubber-elastic" state, but at another point that they could also be stretched when they were in a "solid" state. Counsel for the appellant in his brief characterizes this testimony as such a "tangled maze of contradictions as to be completely stultifying and utterly ludicrous."

Counsel's argument assumes *sub silento* that "solid" means "rigid" and then passes on to the further assumption that matter cannot be "solid" and "elastic" at the same time. The argument rests on a play upon words, for "rigid" and "solid" are not synonymous, and, furthermore, matter cannot be divided finally, definitely and absolutely into the categories of "solid," "elastic," and "fluid." All non-gaseous matter, so far as we know, has some of the characteristics of at least two of the states mentioned. Water is certainly a "fluid" and yet a child learning to dive soon discovers that it has some degree of solidity. And although steel and iron are certainly "solids," anyone who has ever seen and heard a blacksmith "ring" his anvil with his hammer knows that steel will bounce on iron and hence realizes that each must have some elasticity, for after each blow both the anvil and the hammer return to their original form and shape without permanent distortion. Proliferation of instances would serve no purpose. The fact is that the terms do not define absolute but instead relative states of matter. Thus the lines of demarcation be-

tween them cannot be drawn with absolute precision. But, although each state defies precise definition, nevertheless each describes a recognizable condition. No one would say that water is not a "fluid" or that steel and iron are not "solids," or that a rubber band is not "elastic." So also is a golf ball, yet no contradiction in terms is involved in calling it a "solid" as well. The same may be said of a rubber band. The difference between a golf ball and a rubber band lies in degree of solidity and elasticity.

"Elastic," according to Webster's New International Dictionary, Second Edition, means *inter alia* "Springing back; springy; of solids, capable of recovering size and shape after deformation." The amount of deformation may be great or small and recovery of size and shape after deformation may be fast or slow. An ordinary rubber band can be stretched on the application of force to several times its relaxed length and when the force is removed it snaps back at once to its original shape and size. Matter in this state seems to us very appropriately described not only as "elastic" but also as "rubber-elastic," notwithstanding that at the same time it is also a "solid" in the sense that it certainly is not a "fluid" or a "gas." Thus, witness Webster's definition, there is no inconsistency in saying that a "solid" may in addition be "rubber-elastic."

But there is another state or condition of matter in which it can readily be stretched. This is the malleable or plastic state, illustrated by taffy or glazier's putty. Matter in this condition, as in the elastic condition, stretches readily on the application of force, but when the force is removed it remains in the distorted condition in which the force left it. In this state matter is said to be "plastic," and when the condition is produced by heat, "thermoplastic."

The testimony is that transparent, linear high polymers can exist in any one of the general states or conditions mentioned. They can be relatively hard, rigid solids, like the Lucite in which trout flies and other small objects are embedded for

ornamental purposes and from which plates and small boxes are made. And by the application in varying degrees of solvents or heat they can be made progressively to change to a "rubber-elastic" state, to a plastic or thermoplastic state, and eventually by dissolving in the solvent or melting, to a fluid state. We think the term "rubber-elastic" rather happily describes a perfectly recognizable state in which plastics may either exist commercially or be put by the application of heat or the use of solvents called plasticizers.

The question is whether stretching linear, high polymeric material when in a "rubber-elastic" state to the "limit of its extension" to orient its molecules to substantial parallelism, fixing it in that condition to retain its molecular organization, and at some stage of the process dyeing it, in order to produce dichroism, was taught by the art prior to Land, and, if it was not, whether Land's teaching it amounted to invention.

The art before Land, as we have already mentioned, knew that stretching transparent linear high polymeric material tended to align its long thin molecules, that the greater the stretch the more substantial the parallelism of the molecules became, that with the alignment of the molecules the material became birefringent, and if it was colored at some stage of the stretching process with a kind of dye which substantially absorbed the light vibrations in one plane, the material became dichroic, that is, a polarizer. Some of the references are certainly close but we do not read the art prior to Land as clearly teaching or directly indicating the importance or value of stretching in any given state, although perhaps stretch "to the limit of extension" may have been foreshadowed. As far as we can see the stretching of the prior art might have been done when the linear high polymeric material was relatively hard and rigid, as for instance by cold drawing between heavy rollers, or when it was in a plastic state, as well as when it was in a state of "rubber-elasticity." We agree with the District

Court that Land's teaching was not anticipated by the prior art.

And the District Court found that stretching linear high polymeric material in the "rubber-elastic" state to the "limit of extension" as taught by Land (plus, of course, dyeing) produced markedly higher dichroic ratios and hence substantially better polarizers, and that his contribution to the art amounted to invention. This finding in view of our prior discussion does not warrant extended consideration. There can be little doubt that stretch in the "rubber-elastic" state substantially to the "limit of extension" was an exceedingly valuable contribution to the art of making polarizers. Thus, having concluded that Land was the first to make the contribution, there can be no serious question but that his contribution constituted invention.

■ The third Land patent, No. 2,237,567, which issued first, remains for consideration.

In this patent no claim is made of stretching in the "rubber-elastic" state to the "limit of extension." It discloses and claims generally a light polarizer consisting of a sheet of polyvinyl alcohol which has been dyed or stained with a dichroic stain, preferably iodine, and stretched to orient its molecules. Polyvinyl alcohol was known a short time before Land, and so also were certain of its properties, but it does not appear that anyone had thought of it as a material useful for making polarizers. An article published in 1935 showed that it is made up of crystallites which could be parallelized by stretch, which was particularly easy when the material was heated, and that when stretched it was birefringent, and an article published in 1936 disclosed its quantitative capacity to absorb iodine. On the basis of these references the District Court found [129 F.Supp. 264]:

"Land's contribution evidenced by this patent was in taking characteristics of a material, each separately investigated and disclosed in these references, combining them and giving the result a practical application to the art of light-polarization. In

so doing he came up with a commercial polarizer of high efficiency and utility which, I am convinced, represents a significant advance in the art. This polarizer is outstanding, not only for its high efficiency, but also for its ease of manufacture and cheapness.

"Of the three Land patents involved in this litigation, the defendant relies mainly on the disclosures of the '567 patent in conducting its commercial operations in the 3–D viewer field. It would be anomalous to strike down the patent which has proved to the defendant to have the greatest commercial value and save the other two patents. In the absence of a stronger showing by the defendant on the question of validity, this court will not reach such a result."

Consequently the District Court concluded that the issue claims of this patent were valid.

In view of the rather half-hearted argument of the plaintiff-appellant both on this appeal, and apparently also in the court below, we see no reason to enter into an elaborate discussion of the validity of the issue claims of this patent. It will suffice to say that we see no good reason to disturb the finding of validity made by the District Court.

■ This brings us to the question of infringement which again does not call for extended discussion. The District Court found that the defendant Depix Corporation used substantially Land's materials and process to produce substantially Land's product. Its finding is based on the testimony of expert witnesses called by Polaroid who the court below found had made exhaustive scientific tests of Depix' material, and on moving pictures of Depix process shown in court. To be sure this evidence was contradicted by experts called by the plaintiff. Nevertheless the court below was certainly entitled to give controlling significance to the defendant's evidence. Further discussion would serve no purpose. It will be enough to say that the District Court's

finding of infringement, resting as it does on substantial evidence which the court below found convincing, is not open to successful attack on appeal.

■ At this point consideration of the personal liability of plaintiff-appellant Marks' for Depix Corporation's infringement is in order.

Depix was a small family corporation organized by the plaintiff-appellant and his brother. Both men with their mother were the only officers of the corporation and the three owned all of its stock through their ownership of the stock of another corporation which held all the stock of Depix. The District Court found that the plaintiff-appellant supervised and directed the building of the machines and equipment used by Depix in manufacturing its product, that he was thoroughly familiar with the details of the process employed by Depix and with its product, and that he was the patentee of the patents under which Depix allegedly operated and for the exploitation of which it was organized. On the basis of these facts the court below found that Marks not only actively participated in the business of the corporation but also directly contributed to the corporation's infringement, which, the court said, would not otherwise have occurred. On the basis of these facts the court found the plaintiff-appellant to have been the "guiding spirit" behind Depix' infringement and hence liable with it for the infringement complained of by Polaroid.

The above facts certainly show that the plaintiff-appellant was more than merely an officer of an infringing corporation. They show that he, individually was the moving, active conscious force behind Depix' infringement. This is clearly enough to make him personally liable under general principles, see Dean Rubber Mfg. Co. v. Killian, 8 Cir., 1939, 106 F.2d 316, 320, as well as under Title 35 U.S.C. § 271(b) which provides: "Whoever actively induces infringement of a patent shall be liable as an infringer."

■ Questions of the enforceability of the Land patents remain for consideration.

Under this heading the plaintiff-appellant contends first that the patents are unenforceable because they were procured by a fraud practiced upon the Patent Office. He says that this fraud consisted of Land's representation to the Patent Office in the course of prosecuting his application for the '515 patent that by using his "rubber-elastic" stretch a polarizer could be produced with certain materials of the prior art (Cellophane and Congo red), which would have a dichroic ratio of 25 to 1, whereas the best that could be done with the same materials without "rubber-elastic" stretch was at the most a dichroic ratio of 2½ to 1, and, almost simultaneously, telling the Patent Office in prosecuting the application for the '567 patent that the best polarizer that could be produced using Cellophane would have a dichroic ratio of not more than 2½ to 1. It is said that both of these statements cannot possibly be true and, indeed, that both are in fact false.

The District Court discussed only the statement made in prosecuting the application for the '515 patent. It found that statement not literally true. "But," it said, "from a broad consideration of the file wrapper of the patent as a whole, I believe that the statement complained of, although factually untrue, was not the result of a deliberate attempt to falsely represent the facts. I find that it did not deceive or mislead the examiner in his consideration of the patentability of the application pending before him." An examination of the record appendixes and the arguments of counsel leads us to the conclusion that the District Court's conclusion is supported by substantial evidence and is quite correct. We need not elaborate upon the matter.

As to the other representation made in prosecuting the '567 patent we conclude from an examination of the file wrapper that in context the statement was not false. Read in isolation it could be interpreted as an erroneous statement of fact.

But in its setting we do not believe it would have been so understood by the Patent Office Examiner in charge. Full elucidation of the reasons for our conclusion would expand this already overlong opinion to the proportions of the Book of Deuteronomy. It will suffice to say that we find the contention without merit.

■ Now we come to the charge that Polaroid misused its patents.

It sold three dimentional (3–D) viewers, which are spectacle-like devices which give the user the impression that a picture projected upon a screen is in three dimensions. These viewers are of two types, a temporary type and a permanent type. The former were sold for eventual use in moving picture theaters, and as they came to the theater proprietor for distribution to his audience certain restrictions were placed upon their use. These in effect were that the viewers are not to be used more than once, but after one use are to be gathered up and destroyed. The permanent type viewers were sold to manufacturers of stereoscopic equipment for resale as part of a kit for use by amateurs with a stereoscopic projector. A condition of the sale of these viewers imposed by Polaroid was that they were not to be used or resold for use in admission-charging theaters.

Polaroid justified these restrictions on the ground that reuse by the public generally might spread eye infection for which perhaps it might be held liable, and in the case of the temporary viewers, that after one use they were likely to become bent or dirty and hence lose some if not all of their effectiveness. The District Court found that there was ground for some "rational fear of infection and the spread of disease" from the indiscriminate reuse of viewers of both types by the general public which Polaroid could well feel it ought to take measures to guard against. But it also recognized that the restrictions if observed guaranteed an expansion of Polaroid's business. "However," the court said, "on the facts of this case, where there appears to

be present countervailing public policy considerations, I cannot hold that the practices employed by the defendant in connection with the sale of viewers constitute such a misuse of patents as to compel this Court in good conscience to deny the defendant relief on its counterclaim."

The matter lies primarily in the discretion of the District Court. Under the circumstances outlined above we cannot find that in this instance the court abused its discretion.

The judgment of the District Court is affirmed.