2014 DNH 140

**COACH, INC., et al.**

v.

**Peter J. SAPATIS, et al.**

**Civil No. 12–cv–506–PB.**

United States District Court,
D. New Hampshire.

Signed June 23, 2014.

[13]. Documents nos. 43, 44.

[14]. Documents nos. 45, 48.

Erin Corbally, Adler Pollock & Sheehan, Boston, MA, Jeffrey K. Techentin, Kyle Zambarano, Adler Pollock & Sheehan, Providence, RI, for Coach, Inc., et al.

Lisa Snow Wade, Robert S. Carey, Orr & Reno PA, Concord, NH, Jeremy T. Walker, Nicholas F. Casolaro, McLane Graf Raulerson & Middleton PA, Manchester, NH, for Peter J. Sapatis, et al.

### MEMORANDUM AND ORDER

PAUL BARBADORO, District Judge.

This case arises from the sale of counterfeit goods by third party vendors at a flea market in Londonderry, New Hampshire. Coach, Inc. and Coach Services, Inc.,[1] purveyors of designer handbags and other personal goods, have sued Peter J. Sapatis, Londonderry Marketplace, LLC, Alaina E. Paul, and TABA Enterprises, LLC, seeking injunctive relief and damages based on alleged violations of federal trademark and copyright law. Paul and TABA moved for summary judgment. I deny the motion.

## I. BACKGROUND

A detailed background of this case is provided in a previous order, *Coach, Inc. v. Sapatis,* 2014 DNH 021, 994 F.Supp.2d 192, 2014 WL 347712. I thus limit my discussion to those facts that are relevant to Paul's motion for summary judgment.

Paul is the owner, manager, and sole member of TABA, a limited liability corporation that has both owned the Londonderry Flea Market and leased the land upon which it operates since 2008. Doc. No. 30–5. All vendors at the Flea Market contract exclusively with TABA to rent space for their booths. Doc. No. 30–2. Paul exercises direct control over all of TABA's employees, delegates certain duties to them, and retains ultimate authority over them.[2] Doc. Nos. 30–2, 47–4. Paul also retains sole responsibility for TABA's anti-counterfeiting efforts. Doc. No. 47–4.

Since 2008, Paul has been present at the Flea Market every day that it has been open. *Id.* Although the bulk of Paul's day-to-day activities are devoted to the operation of the concession stand, she admits that she is "responsible for everything" at the Flea Market. Doc. No. 42–11. Paul personally participates in activities such as "checking in vendors who want to rent space, assigning them [to their spaces], listening to vendors['] . . . suggestions, checking on vendors, especially now to

---

1. Coach, Inc. and Coach Services, Inc. have referred to themselves collectively as "Coach" throughout the pleadings. I follow their lead here.

2. For instance, Paul delegated the task of supervising a group of vendors at the Flea Market who sold handbags, accessories, women's wear, and other clothing to Linda Morrow, a TABA employee. Doc. No. 42–11. The vendors who allegedly sold counterfeit Coach products were part of this group. *Id.* The Flea Market's previous owner, Sapatis, was also significantly involved in the Flea Market's operations. *See Sapatis,* 2014 DNH 021, 18–19, 994 F.Supp.2d at 201. Coach argues that Sapatis acted as Paul's agent despite not being employed by TABA, a contention I need not address at this time.

make sure that they're following policies[, and].... help[ing] customers." *Id.* In addition, Paul collaborates with Sapatis and Morrow to create and revise the Flea Market's vendor policies, which include a prohibition on the sale of counterfeit goods. *Id.*

Paul also controls the Flea Market's e-mail account, londonderryfleamarket@gmail.com, which is used to communicate with customers and vendors. Doc. Nos. 47–7, 47–8. Between February 2011 and December 2012, 655 of the email messages sent from this account identified Sapatis as the sender, 45 identified Paul as the sender, and an indefinite number of messages failed to identify a sender. Doc. No. 36. Nevertheless, Paul alleges that she is the only person with access to the account and is the only individual who has ever sent messages from it. Doc. No. 47–7. She explained that she wrote Sapatis's name on email messages "[b]ecause he has more knowledge than me, in certain instances. I don't have a cell phone. People can't get ahold of me. If they are going to call the office, they would call [Morrow] or him." *Id.*

No email message sent or received since 2008 expressly references Coach products, whether authentic or counterfeit.[3] *See* Doc. No. 47–8. Nonetheless, Paul responded to a number of messages from customers who expressed a general interest in purchasing counterfeit goods at the Flea Market, including the types of products that Coach manufactures. For example, on May 16, 2011, a customer asked whether the Flea Market "ha[s] vendors with knockoff purses." Paul responded

later that day that "[t]here are so many sellers / vendors at this flea market & a WIDE selection of items.... You will find MANY bargains—I'd say come & visit, with cash in your pocket!" Another customer inquired on July 14, 2011 whether "your flea market offer[s] knock off bags." Later that day, Paul responded that "[t]here are so many items to look at & buy; including handbags / pocketbooks. You most likely will be satisfied with visiting."[4] Another customer's email message referenced the "1st 3–4 rows of vendors ... selling the pocketbooks"—rows purportedly including the vendors selling counterfeit Coach goods. Additional messages inquired into whether counterfeit goods imitating other designer brands could be purchased at the Flea Market. *Id.*

On June 26, 2011, two private investigators working for Coach inspected the Flea Market, purchased a number of counterfeit Coach products from vendors, and served approximately thirty vendors selling such merchandise with cease and desist letters. Doc. No. 53–3. Paul claims that she was working at the concession stand during the inspection and learned of the inspection afterward from Morrow, who had accompanied the investigators. Doc. No. 42–11. The investigators returned to inspect the Flea Market on multiple occasions over the next year. They identified a number of vendors who were selling counterfeit Coach goods during several visits and informed Sapatis of that fact immediately following at least one of the inspections. Doc. No. 53–3.

---

**3.** In an interrogatory answer, Coach claims that at least one customer sent an email message mentioning Coach products, Doc. No. 42–13, but the alleged message has not been produced.

**4.** Paul initially misconstrued the customer's email as an inquiry about selling products as a vendor at the Flea Market. She first sent the customer a list of vendor policies, including a statement that "illegal & counterfeit items are not allowed." Doc. No. 47–8.

On or about August 2, 2011, Paul received a letter from Coach alleging that counterfeit Coach products were being sold by Flea Market vendors and that those responsible for the Flea Market's operations could be held liable if they failed to stop this activity. Doc. Nos. 36–1, 47–4. Paul received a similar letter on or about May 14, 2012. Doc. No. 36–3, 47–4. Neither Paul nor any TABA employee ever communicated with Coach or any of its representatives prior to Coach suing Paul and TABA in June 2013. Doc. No. 36–2.

## II. *STANDARD OF REVIEW*

Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). An issue is considered genuine if the evidence allows a reasonable jury to resolve the point in favor of the nonmoving party, and a fact is considered material if it "is one 'that might affect the outcome of the suit under the governing law.'" *United States v. One Parcel of Real Prop. with Bldgs.*, 960 F.2d 200, 204 (1st Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In ruling on a motion for summary judgment, I examine the evidence in the light most favorable to the nonmoving party. *Navarro v. Pfizer Corp.*, 261 F.3d 90, 94 (1st Cir.2001).

The party moving for summary judgment bears the initial burden of identifying the portions of the record it believes demonstrate an absence of disputed material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining what constitutes a material fact, "we safely can ignore 'conclusory allegations, improbable inferences, and unsupported speculation.'" *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990)).

## III. *ANALYSIS*

Paul moves for summary judgment on the three remaining counts in Coach's amended complaint: (1) contributory trademark counterfeiting (15 U.S.C. § 1114); (2) contributory trademark infringement (15 U.S.C. § 1114); and (3) contributory copyright infringement (17 U.S.C. § 501).[5] In a prior order, I discussed the relevant law pertaining to each of these claims. *See Sapatis*, 2014 DNH 021, 12–18, 23–25, 994 F.Supp.2d at 197–98, 203. To succeed on its claims, Coach must demonstrate that Paul (1) knew or had reason to know of the alleged infringement of Coach's trademarks and copyrights at the Flea Market; (2) exercised sufficient control over the vendors engaged in the ongoing infringement;[6] and (3)

---

**5.** I consider Counts I and II collectively under the more frequently used term "contributory trademark infringement." *See Sapatis*, 2014 DNH 021, 11, 994 F.Supp.2d at 198 (citing *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 489, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) (Blackmun, J., dissenting)).

**6.** This element pertains to a claim for contributory trademark infringement; in contrast, contributory copyright infringement claims employ a "material contribution to the infringing activity" standard. *Sapatis*, 2014

DNH 021, 24, 994 F.Supp.2d at 202 (quoting *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir.1996)). Although the two standards are similar, "[contributory] trademark infringement liability is more narrowly circumscribed than [contributory] copyright infringement." *Id.* (quoting *Fonovisa*, 76 F.3d at 265); *accord Sony*, 464 U.S. at 439 n. 19, 104 S.Ct. 774. My statement in *Sapatis* remains true here: "If a reasonable jury could find that [Paul's] actions satisfied the ... contributory trademark infringement standard, it could similarly find that they sat-

failed to take sufficient steps to stop it. *See, e.g., 1–800 Contacts, Inc. v. Lens.com, Inc.,* 722 F.3d 1229, 1254 (10th Cir.2013); *Coach, Inc. v. Goodfellow,* 717 F.3d 498, 505 (6th Cir.2013); *Tiffany (NJ), Inc. v. eBay, Inc.,* 600 F.3d 93, 103 (2d Cir.2010); *see also Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 854, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982) ("[I]f a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorially responsible for any harm done as a result of the deceit."). Here, Paul only attacks the first two elements: her knowledge of, and control over, the infringing activity.[7]

Paul first argues that she cannot be held personally liable because she was acting at all times as a representative of TABA, the corporation that owns and operates the Flea Market. As Paul sees it, she cannot be held personally liable for contributory infringement because whatever knowledge she obtained or control she exercised in her role as TABA's owner, manager, and sole shareholder may only be imputed to TABA. She argues in the alternative that, given her status as a corporate officer, she may only be held personally liable for contributory infringement if she was the "moving, active, conscious force who caused the infringement." *See, e.g., Chanel, Inc. v. Italian Activewear of Fla., Inc.,* 931 F.2d 1472, 1478 n. 8 (11th Cir.1991). Both arguments misstate the relevant law.

## A. A Corporation's Agents May Be Held Personally Liable For Their Own Conduct

Contributory infringement in the trademark and copyright context is a judicially-created doctrine rooted in basic common law tort principles. *See, e.g.; Metro-Goldwyn–Mayer Studios Inc. v. Grokster, Ltd.,* 545 U.S. 913, 930, 125 S.Ct. 2764, 162 L.Ed.2d 781 (2005) ("Although the Copyright Act does not expressly render anyone liable for infringement committed by another, these doctrines of secondary liability emerged from common law principles and are well established in the law." (internal citations, alterations, and quotation marks omitted)); *Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.,* 955 F.2d 1143, 1149 (7th Cir.1992) ("[Defendant] is responsible for the torts of those it permits on its premises 'knowing or having reason to know that the other is acting or will act tortiously'.... In the absence of any suggestion that a trademark violation should not be treated as a common law tort, we believe that the *Inwood Labs.* test for contributory liability applies." (quoting Restatement (Second) of Torts § 877(c) & cmt. d (1979))). Because both the Lanham Act and the Copyright Act are silent as to secondary liability for another's direct infringement, common law tort and agency principles apply. *See, e.g., 1–800 Contacts,* 722 F.3d at 1240 (citing *AT & T Co. v. Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1433–34 (3d Cir. 1994)) ("[T]he Lanham Act incorporates common-law agency principles."). These principles clearly indicate that Paul may be held personally liable for contributory

---

isfied the less stringent 'material contribution' standard for contributory copyright infringement." *See id.* Consequently, my discussion of Coach's contributory trademark infringement claim applies to the contributory copyright infringement claim unless otherwise noted.

7. I therefore take no position at this time as to the sufficiency of any remedial steps undertaken by Paul or her associates to stop the infringement. *Cf. Coach, Inc. v. Gata Corp.,* No. 10–CV–141–LM, 2011 WL 2358671, at *7–10 (D.N.H. June 9, 2011).

infringement, regardless of her relation to TABA.

A corporation can act only through its agents. *Daimler AG v. Bauman,* — U.S. ——, 134 S.Ct. 746, 759 n. 14, 187 L.Ed.2d 624 (2014). Consequently, Paul's claim that TABA's alleged contributory infringement cannot be imputed to her personally places the cart before the horse. If TABA is to be deemed liable for contributory infringement, it is because it is vicariously liable for the contributory infringement of its agent(s). *See* Restatement (Third) of Agency § 7.04 (2006) ("A principal is subject to liability to a third party harmed by an agent's conduct when the agent's conduct is within the scope of the agent's actual authority or ratified by the principal; and (1) the agent's conduct is tortious, or (2) the agent's conduct, if that of the principal, would subject the principal to tort liability."). One must consider the personal liability of the corporation's agent(s) before there is any discussion of the corporation's liability.

It is true, as Paul argues, that her mere "status as an officer of a corporation that has allegedly [contributorially] infringed . . . without more, is not a basis for liability as a contributory infringer." *See Desmond v. Chi. Boxed Beef Distribs., Inc.,* 921 F.Supp.2d 872, 886 (N.D.Ill.2013) (quoting *Do It Best Corp. v. Passport Software, Inc.,* No. 01 C 7674, 2004 WL 1660814, at *15 (N.D.Ill. July 23, 2004)). Actions taken or knowledge obtained by a corporation via its agents is not imputed to its officers simply due to their positions within the corporation. *See, e.g., Arista Records, Inc. v. Flea World, Inc.,* No. 03–2670, 2006 WL 842883, at *18 (D.N.J. Mar. 31, 2006) ("[Individual defendants] are not imputed to enjoy the same knowledge as their corporations, nor are they presumed to have engaged in the same acts or omissions as their corporations, merely by their status as corporate officers or owners."). But it does not follow that the corporate form automatically immunizes corporate officers from personal liability for conduct undertaken on the corporation's behalf. *See Mone v. Dranow,* 945 F.2d 306, 308 (9th Cir.1991) ("[F]ederal common law hold[s] that corporate officers are personally liable for their torts even if the torts were committed on behalf of the corporation."); Restatement (Third) of Agency § 7.01 cmt. d ("[A]n organizational officer is subject to liability when the officer directly participates in conduct that constitutes a tort."); *see also id.* § 7.01 ("Unless an applicable statute provides otherwise, an actor remains subject to liability although the actor acts as an agent or an employee, with actual or apparent authority, or within the scope of employment."). Paul's personal contributory liability is dependent on her own knowledge and control over the vendors' alleged infringement, regardless of whether her actions or omissions were taken in an official or personal capacity.[8] *See Polo Fashions, Inc. v. Craftex, Inc.,* 816 F.2d 145, 149 (4th Cir.1987) (recognizing that a corporate official may be held personally liable for trademark infringement even though he acted to benefit the corporation).

---

**8.** Thus, Coach need not pierce the corporate veil if Paul's own conduct would render her personally liable. *See, e.g., Babbit Elecs., Inc. v. Dynascan Corp.,* 38 F.3d 1161, 1184 (11th Cir.1994) ("[A] corporate officer who directs, controls, ratifies, participates in, or is the moving force behind the infringing activity, is personally liable for such infringement without regard to piercing of the corporate veil."); Restatement (Third) of Agency § 7.01 cmt. d ("If an organizational officer participates in wrongful conduct, the officer is subject to liability. . . . [I]t is not necessary to 'pierce the corporate veil' or 'disregard the corporation's existence as a separate legal entity'. . . .").

**B.** *The Same Contributory Liability Standard Applies to All Defendants*

■ Paul next argues that, even if her individual knowledge and conduct may be considered, she cannot be held personally liable because she was not the "moving, active, conscious force who caused the infringement." [9] To the extent that the test Paul cites is construed to impose a different standard than that applicable to any other individual or entity charged with contributory infringement,[10] I disagree and decline to apply it here.

Many courts have used the "moving, active, conscious force" language to analyze a corporate officer's liability for trademark, copyright, and patent infringement under both direct and secondary theories of liability. *See, e.g., Chanel*, 931 F.2d at 1477–78 & n. 8 (direct trademark infringement); *Power Lift, Inc. v. Lang Tools, Inc.*, 774 F.2d 478, 481 (Fed.Cir.1985) (inducing patent infringement); *Int'l Mfg. Co. v. Landon, Inc.*, 336 F.2d 723, 728–29 (9th Cir.1964) (same); *Warren v. John Wiley & Sons, Inc.*, 952 F.Supp.2d 610, 618–19 (S.D.N.Y.2013) (contributory copyright infringement); *Microsoft Corp. v. Suncrest Enter.*, No. C03–5424 JF (HRL), 2006 WL 1329881, at *7 (N.D.Cal. May 16, 2006) (contributory trademark infringement); *see also Major League Baseball Promotion Corp. v. Colour–Tex, Inc.*, 729 F.Supp. 1035, 1043 (D.N.J.1990) (corporate officer who was the "conscious, dominant and active force" behind infringing activity held liable for direct trademark and copyright infringement). The standard has also been employed in at least one analogous flea market case. *Coach Inc. v. Kim's Management, Inc.*, No. 1:10–CV–02746–jJOF, slip op. at 36–37 (N.D.Ga. Feb. 28, 2012) (contributory trademark infringement). Nevertheless, this precedent does not persuade me that the standard should be applied to Coach's claims against Paul.

The phrase "moving, active conscious force" first appeared in *Marks v. Polaroid Corp.*, 237 F.2d 428, 435 (1st Cir.1956), which considered whether a corporate officer could be held liable under the Patent Act for "actively induc[ing] infringement of a patent." [11] *See* 35 U.S.C. § 271(b). The

---

9. Paul also argues that a corporate officer is only liable for contributory or direct copyright infringement if he or she "knowingly participates" in the infringing activity. *See, e.g., Arista Records*, 2006 WL 842883, at *17 ("[A]n officer or director of a corporation who knowingly participates in [copyright] infringement can be held personally liable, joint and severally, with the corporate defendant." (second alteration in original) (quoting *Columbia Pictures Indus., Inc. v. Redd Horne, Inc.*, 749 F.2d 154, 160 (3d Cir.1984))); *see also* 1 Niel Boorstyn, *Boorstyn on Copyright* § 10.06[2], at 10–21 (1994) ("[T]he common law doctrine that one who knowingly participates in or furthers a tortious act is jointly and severally liable with the prime tortfeasor, is applicable under copyright law."). To the extent that a "knowing participation" requirement implies a different standard than that applicable to any other individual or entity charged with contributory copyright infringe-

ment, I decline to adopt it for the same reasons that I discuss in the trademark context.

10. For instance, courts have interpreted the "moving, active conscious force" standard to require that a corporate officer "actively and knowingly caused the infringement." *See, e.g., Chanel*, 931 F.2d at 1477. In contrast, an individual or entity may generally be held liable for contributory infringement if it *fails* to act once it has actual knowledge, has reason to know, or is willfully blind to the fact that it is supplying a service to one who is engaging in direct trademark infringement. *See, e.g., Inwood*, 456 U.S. at 854, 102 S.Ct. 2182; *Hard Rock*, 955 F.2d at 1149 (citing Restatement (Second) of Torts § 877(c) & cmt. d).

11. *Marks* was the first case to interpret § 271(b) following Congress's codification of secondary liability for patent infringement in 1952.

standard was adopted by several courts considering § 271(b) claims over the following three decades before it was first extended beyond the patent context in *Polo Fashions, Inc. v. Branded Apparel Merch., Inc.*, 592 F.Supp. 648, 652 (D.Mass.1984) (holding a corporate officer personally liable for a corporation's direct trademark infringement). Without citing to any section of the Lanham Act, the *Polo Fashions* court posited that "[a]lthough a corporate officer is not always individually liable for torts committed while acting on behalf of the corporation, if the officer is a 'moving, active conscious force behind [the defendant corporation's] infringement,' then the officer will be held personally liable" for trademark infringement. *Id.* (second alteration in original) (quoting *Marks*, 237 F.2d at 435).

The *Polo Fashions* court failed to provide any explanation for this statement beyond its citation to *Marks*. It also failed to explain that it was borrowing a standard construing a specific subsection of the Patent Act for application in the trademark context, this despite the lack of an analogous provision in the Lanham Act. The omission is particularly notable given that the statutory provision at issue in *Marks*

dealt with "active[ ] induce[ment]" of patent infringement, *see* 35 U.S.C. § 271(b), rather than a separate Patent Act provision prohibiting "contributory infringe[ment]." *See* 35 U.S.C. § 271(c).[12] Lastly, it failed to acknowledge the Supreme Court's then recent statement that the "trademark right 'has little or no analogy' to copyright or patent." *See Sony*, 464 U.S. at 439 n. 19, 104 S.Ct. 774 (quoting *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97, 39 S.Ct. 48, 63 L.Ed. 141 (1918)).

■ Courts following *Polo Fashions* have continued to apply the "moving, active, conscious force" standard to determine whether a corporate officer is personally liable in trademark (and copyright) infringement claims, generally without explanation beyond citation to prior cases. Notwithstanding this line of cases—none of which is binding on this court—the application of a unique liability standard to a discreet class of defendants in trademark and copyright infringement cases does not withstand scrutiny. Contributory trademark and copyright infringement are federal common law doctrines, and there is no common law basis for imposing an alterna-

---

**12.** The Supreme Court did not reference—much less rely on—the Patent Act or cases construing it when it announced its two-pronged standard for contributory trademark infringement. *See Inwood*, 456 U.S. at 854, 102 S.Ct. 2182. There is nevertheless a notable similarity between the *Inwood* trademark standard and the two subsections of the Patent Act concerning secondary liability for patent infringement. *Compare id.* ("[I]f a manufacturer or distributor [1] intentionally induces another to infringe a trademark, or if it [2] continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorially responsible for any harm done as a result of the deceit."), *with* 35 U.S.C. § 271(b) ("Whoever actively induces infringement of a patent shall be liable as an infringer."), *and*

*id.* § 271(c) ("Whoever offers[,] ... sells[,] or imports ... a component of a patented machine ... constituting a material part of the invention, knowing the same to be ... especially adapted for use in an infringement of such patent ... shall be liable as a contributory infringer."). Since *Marks*, courts have applied the "moving, active conscious force" standard to § 271(b) "active inducement" claims with some frequency, whereas no court has applied it to a § 271(c) "contributory infringement" claim. *But cf. Rohm & Haas Co. v. Dawson Chem. Co., Inc.*, 557 F.Supp. 739, 819 (S.D.Tex.1983) (applying the "moving, active conscious force" standard without clarifying which provision of the Patent Act it was relying upon), *rev'd sub nom. Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556 (Fed.Cir.1983).

tive tort liability standard based solely on a defendant's status as an agent of an organization. *See, e.g.,* Restatement (Third) of Agency § 7.01 & cmt. d; Restatement (Second) of Torts § 877(c) & cmt. d. Consequently, Paul's personal liability for contributory infringement will be judged under the same standard that would apply to any other defendant. *See Sapatis,* 2014 DNH 021, 14–15, 994 F.Supp.2d at 199 (citing *Lockheed Martin Corp. v. Network Solutions, Inc.,* 194 F.3d 980, 984 (9th Cir.1999); *Fonovisa,* 76 F.3d at 265; *Hard Rock,* 955 F.2d at 1148–49) ("[T]he relevant inquiry is . . . whether the defendant had sufficient control over the individuals directly engaging in [trademark] infringement.").

Accordingly, I first consider Paul's knowledge of the vendors' alleged trademark and copyright infringement before determining whether she "had sufficient control over the individuals directly engaging in" the infringement.

## C. *Paul's Knowledge of the Infringing Activity*

The threshold inquiry is whether Paul knew, or had reason to know, of particular instances of trademark and copyright infringement at the Flea Market. *See Goodfellow,* 717 F.3d at 503 (citing *Inwood,* 456 U.S. at 854, 102 S.Ct. 2182); *see also Sony,* 464 U.S. at 487, 104 S.Ct. 774 (Blackmun, J., dissenting) (citing *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.,* 443 F.2d 1159, 1162 (2d Cir.1971)) ("Contributory infringement has never depended on actual knowledge of particular instances of infringement; it is sufficient that the defendant have reason to know that infringement is taking place."). Willful blindness of infringing activity is sufficient to meet this standard. *See, e.g., Goodfellow,* 717 F.3d at 503 (citing *Hard Rock,* 955 F.2d at 1149) ("[A] flea market operator who deliberately fails to investigate suspected infringing activity by vendors . . . may be subject to contributory liability."); *Luvdarts, LLC v. AT & T Mobility, LLC,* 710 F.3d 1068, 1073 (9th Cir.2013) (citing *Global–Tech Appliances, Inc. v. SEB S.A.,* — U.S. ——, 131 S.Ct. 2060, 2070, 179 L.Ed.2d 1167 (2011)) ("In order to allege willful blindness, [plaintiff] must allege that [defendants] (1) subjectively believed that infringement was likely occurring . . . and that they (2) took deliberate actions to avoid learning about the infringement.").

A reasonable jury could certainly find that Paul had sufficient knowledge of specific acts of trademark infringement at the Flea Market as of June 26, 2011, if not earlier. On that date, Morrow accompanied two private investigators hired by Coach as they inspected the Flea Market and served cease and desist letters to approximately thirty vendors selling counterfeit Coach products. Paul was present at the Flea Market and aware of the inspection as it was occurring. She learned from Morrow soon afterward that some vendors had been issued the letters for selling counterfeit Coach products and that these vendors had been asked to leave the Flea Market.

Paul testified that following the inspection, "I didn't go up there and [personally] tell [the identified vendors to leave], because I don't know who they are." Doc. No. 42–11. But after her conversation with Morrow—a TABA employee reporting directly to Paul with firsthand knowledge of the infringing vendors' identities—Paul clearly had reason to know of particular instances of alleged infringement by particular vendors. Paul was ultimately responsible for all aspects of the Flea Market's operations, including its anti-counterfeiting efforts; if she neglected to ask Morrow to identify the relevant vendors or

failed to personally investigate the matter further, she was likely willfully blind to the vendors' unlawful conduct. *See, e.g., UMG Recordings, Inc. v. Sinnott,* 300 F.Supp.2d 993, 1000 (E.D.Cal.2004). Accordingly, Paul cannot credibly claim that she lacked sufficient knowledge of the alleged trademark infringement.[13]

### D. Paul's Control Over Vendors and Contribution to Their Infringement

■ Paul next argues that she did not "continue[ ] to supply [services]" to vendors whom she knew or had reason to know were infringing Coach's trademarks because she did not exercise "sufficient control over the individuals directly engaging in [the] infringement." *See Inwood,* 456 U.S. at 854, 102 S.Ct. 2182; *Sapatis,* 2014 DNH 021, 14–15, 994 F.Supp.2d at 199. I disagree.

Paul's responsibilities and conduct at the Flea Market permit a reasonable inference that she "had sufficient control over the individuals directly engaging in [trademark] infringement." *See Sapatis,* 2014 DNH 021, 14–15, 994 F.Supp.2d at 199. Despite her typical presence at the Flea Market's concession stand, Paul was in close proximity to the infringing vendors every day that the Flea Market was open. She clearly had the right and ability to police their conduct. *Cf. Perfect 10, Inc. v. Amazon.com, Inc.,* 508 F.3d 1146, 1174 (9th Cir.2007) (noting the significance in *Fonovisa* that the defendant "had the ability to identify and police infringing activity by patrolling its premises"); *Gata,* 2011 WL 2358671, at *7 ("The issue of proximity [between the defendant and the infring-

ing vendors] ... is related to the issue of control, which is a key component of the analysis."). Although Paul delegated many tasks to others, she actively checked vendors in, assigned their spaces, verified their compliance with policies she had helped to create, and received their suggestions.

Most importantly, TABA leased the space and provided the support services necessary for vendors to allegedly sell counterfeit Coach goods at the Flea Market. *Cf. Perfect 10, Inc. v. Visa Int'l Serv. Ass'n,* 494 F.3d 788, 799 (9th Cir.2007) ("The swap meet operator in *Fonovisa* ... increased the level of infringement by providing a centralized place ... where infringing works could be collected, sorted, found, and bought, sold, or exchanged."); *Fonovisa,* 76 F.3d at 264 ("[I]t would be difficult for the infringing activity to take place in the massive quantities alleged without the support services provided by the [flea market]. These services include, *inter alia,* the provision of space, utilities, parking, advertising, plumbing, and customers."). As the owner, manager, and sole member of TABA, Paul bound TABA to contracts with third parties, *see, e.g.,* Doc. No. 30–5, and was ultimately responsible for the decision to enter into, terminate, or refrain from terminating vendors' lease agreements. *See, e.g.,* Doc. No. 36–5 ("Counterfeit ... items are not to be brought/sold at the flea market.... Management ... reserves the right to refuse admission to any vendor ... at any time.").

---

**13.** It is unclear whether Morrow or Paul was aware that vendors were allegedly infringing Coach's copyrights as well as their trademarks at the time of the June 26 inspection. The first letter Paul received from Coach on August 2, 2011 only references trademark infringement. Doc. No. 36–1. However, the second letter that Paul received from Coach on or about May 14, 2012 alleges ongoing copyright infringement at the Flea Market. Doc. No. 36–3. This second letter was sufficient to put Paul on notice of the vendors' alleged copyright infringement, at least as of this later date.

A jury could reasonably infer based on these facts that Paul had the right and ability to exercise "[d]irect control and monitoring of the instrumentality used by a third party to infringe the plaintiff's mark" and "to remove infringing material ... or directly stop their distribution" at the Flea Market. *See Visa Int'l*, 494 F.3d at 807 (quoting *Lockheed Martin*, 194 F.3d at 984). This is sufficient to render Paul potentially liable for contributory infringement. *See Sapatis*, 2014 DNH 021, 14–18, 23–25, 994 F.Supp.2d at 199–201.

## IV. CONCLUSION

For the reasons discussed above, I deny the motion for summary judgment.[14] (Doc. No. 42).

SO ORDERED.

---

**14.** TABA has also moved for summary judgment with respect to Coach's state law unfair competition claim. Doc. No. 42. Coach has since waived that claim with respect to both TABA and Paul. Doc. No. 47–1. Consequently, I deny TABA's motion as moot.